[No. F047759. Fifth Dist. Aug. 2, 2006.]

FRAZIER NUTS, INC., et al., Plaintiffs and Appellants, v.
AMERICAN AG CREDIT, Defendant and Respondent.

J. BAXTER KNIGHT et al., Plaintiffs and Appellants, v.
AMERICAN AG CREDIT, Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part IV. of Discussion.

Counsel

Drummond & Associates, Bridget B. Laurent and Donald F. Drummond for Plaintiffs and Appellants.

Abbey, Weitzenberg, Warren & Emery, Patrick W. Emery, John W. Alden and Rachel K. Nunes for Defendant and Respondent.

Opinion

**DAWSON, J.**—Creditors of a bankrupt almond processor each claim superior rights to proceeds generated by the processor's sale of almonds. The processor paid the proceeds to its secured lender to reduce its loan balance. Unpaid almond growers that sold their crops to the processor on credit sued the secured lender to recover the proceeds. The growers claimed California's producer's lien statute gave them rights to the proceeds that were superior to the lender's security interest.

The trial court ruled in favor of the secured lender by (1) sustaining a demurrer to the growers' claims of conversion and unfair business practices and (2) granting summary judgment on the growers' remaining claims for

intentional interference with contractual relations, unjust enrichment, and money had and received.

The growers appeal and ask this court to resolve a question of law that has not been addressed by a California appellate court—to wit, whether California's producer's lien statute grants a producer rights to the proceeds from a processor's sale of farm products that have priority over the rights of other claimants.

We conclude that the provision in Food and Agricultural Code section 55638[1] that imposes a legal obligation on processors to use the proceeds of sales of farm products to pay producers necessarily creates a correlative right in producers to be paid from the proceeds generated by such sales. The producer's right to be paid from the proceeds meets the ordinary definition of "lien." As a lien granted to producers, the right to be paid from the proceeds constitutes a "producer's lien" for purposes of the priority provisions contained in section 55633. As a result, the growers' claims to the proceeds from the processor's sale of almonds are prior in dignity to the lender's claim based on its security interest.

Therefore, the judgment will be reversed. The growers may pursue theories of recovery for money had and received, conversion, unjust enrichment (quasi-contract), and unfair business practices.

### FACTS

Each of the numerous plaintiffs in this case is an almond grower (collectively, Growers). Central Valley Processing, Inc. (Processor), a California corporation, was a processor of almonds with facilities located in Merced, California. Defendant American Ag Credit (Secured Lender) is a production credit association[2] that acts as an agricultural lender and has an office in Merced, California.

Growers delivered almonds from the 2002–2003 harvest to Processor. Each Grower delivered its almonds pursuant to a contract with Processor and in return received a promise of payment by Processor.

---

[1] All further statutory references are to the Food and Agricultural Code unless otherwise indicated.

[2] Although Growers contend Secured Lender has failed to establish it is a production credit association as a matter of undisputed fact, we will assume for purposes of this appeal that Secured Lender is a production credit association and thus is a federally chartered instrumentality of the United States. (See 12 U.S.C. § 2071(a) [production credit association is an instrumentality of the United States].)

On April 5, 2000, Processor began a lending relationship with Secured Lender's predecessor in interest, Central Valley Production Credit Association, which extended a $4 million revolving line of credit to Processor. The initial disbursement under the line of credit was approximately $2.3 million used by Processor to pay off a preexisting loan from California Federal Bank. In November 2000, Processor paid the balance on its line of credit with Central Valley Production Credit Association to zero and maintained that zero balance until another draw was taken on January 4, 2001.

On June 25, 2001, Processor executed documents reflecting a $4,001,000 line of credit with Secured Lender. Processor paid the line of credit balance to zero in late November 2001, and drew against the line of credit on January 22, 2002. When the line of credit matured on April 1, 2002, the balance Processor owed was $4 million. Secured Lender renewed the line of credit on July 9, 2002, and established a new maturity date of November 1, 2002. The principal sum of the renewed line of credit was $4 million. The collateral securing Secured Lender's line of credit included Processor's inventory, accounts receivable, and the equipment at the facility Processor operated in Merced, California.[3]

The line of credit also was secured by the personal guarantees of five of Processor's shareholders. The five persons were the general partners of Merced Almond Venture, a California general partnership, which held title to the real estate where Processor's facility was located.[4]

Processor did not pay the line of credit to zero by the November 1, 2002, maturity date. As a result, the loan officer sent Processor a letter dated December 11, 2002, that (1) described an earlier discussion between the loan officer and Processor about sources of funds for the repayment of the line of credit and (2) stated "[i]t is imperative that this loan pay to $0 as agreed."

---

[3] Pursuant to California Uniform Commercial Code section 9315, subdivision (a)(2), Secured Lender's security interest automatically attached also to "identifiable proceeds of collateral."

The record created below does not indicate that the security interest was perfected. (See Cal. U. Com. Code, § 9315, subds. (c) & (d) [perfection of a security interest in proceeds].) To show on appeal that its security interest was perfected, Secured Lender requested judicial notice be taken of a financing statement and two form UCC-2's filed with the California Secretary of State. Because this request for judicial notice is, in effect, an inappropriate request to amend Secured Lender's separate statement of undisputed facts and because perfection is not material to the outcome of this appeal, the request is denied.

[4] The guarantees, among other things, create an economic incentive for the guarantors to see that the debt they have guaranteed is paid before debt they have not guaranteed.

On February 21, 2003, Processor filed a chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Eastern District of California. Processor's bankruptcy case was converted to a chapter 7 proceeding on November 26, 2003.

Between the July 2002 renewal of Processor's line of credit and its filing for bankruptcy, Processor paid Secured Lender (1) $94,448.21 on July 26, 2002, (2) $300 on August 20, 2002, (3) $51,550.68 on October 1, 2002, and (4) $243,024.64 on December 12, 2002.[5] Secured Lender asserts that the only payment of principal it received under the line of credit was in the amount of $200,000, thus implying that the other amounts received were for interest and fees.

Pursuant to an order of the bankruptcy court dated June 2003, additional funds were paid to Secured Lender subject to any claims that Growers might have had to those funds.

## PROCEEDINGS

Two groups of Growers filed complaints against Secured Lender. The cases were consolidated. All Growers assert claims against Secured Lender based on the same five legal theories—(1) intentional interference with economic relations, (2) money had and received, (3) conversion, (4) unjust enrichment, and (5) unfair business practice in violation of section 17200 of the Business and Professions Code.[6]

Secured Lender filed a demurrer contending that the five legal theories asserted by Growers all failed to state a claim. The superior court sustained the demurrer without leave to amend as to the third cause of action, for conversion, and the fifth cause of action, for violation of the unfair competition law, and otherwise overruled it.

In December 2004, Secured Lender moved for summary judgment or, in the alternative, for summary adjudication as to the remaining claims asserted by Growers. Secured Lender contended that Growers could not show (1) that it engaged in any conduct that induced Processor to breach its contracts with Growers, (2) that Secured Lender received any money to which Growers

---

[5] The payment on December 12, 2002, may have been in response to the loan officer's letter dated December 11, 2002.

[6] In *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 558, footnote 2 [71 Cal.Rptr.2d 731, 950 P.2d 1086], the California Supreme Court referred to Business and Professions Code sections 17200 through 17209 as the unfair competition law.

were entitled, or (3) that Secured Lender was enriched at the expense of Growers.

The superior court granted Secured Lender's motion for summary judgment on the grounds that (1) Secured Lender's mere acquiescence in Processor's decision not to pay Growers was insufficient to create a triable issue of fact whether Secured Lender intentionally interfered with the contractual relationships between Processor and Growers and, (2) Growers' statutory lien did not extend to the accounts receivable or sale proceeds arising out of the sale of the 2002 crop by Processor.

Judgment in favor of Secured Lender was filed on March 28, 2005. Growers filed a notice of appeal on April 5, 2005.

## DISCUSSION

The fundamental dispute between Growers and Secured Lender concerns Growers' claims to the proceeds generated by Processor's sale of almonds to third parties.

Growers contend they are entitled "to recover the wrongfully diverted proceeds of the sale of their almonds." First, they contend, they had clear contractual rights to those proceeds; second, they had rights under those provisions of the producer's lien statute that address proceeds from the sale of processed farm products.

In contrast, Secured Lender contends that all of Growers' legal theories fail because Growers had no lien or other right, at any time, in the almond sale proceeds. Secured Lender also contends that its rights as the holder of a security interest in Processor's inventory, accounts receivable, and proceeds lawfully entitled it to collect the proceeds from the almond sales.

These contentions can be reduced to two specific issues. First, did Growers have any rights to the proceeds from the almond sales? Second, if Growers had rights to the proceeds, are those rights superior to a security interest?[7]

### I. *Growers Held Rights to the Proceeds*

#### A. *Background on Statutory Producer's Lien*

 Producer's liens in farm products held by processors are the subject of division 20 (Processors, Storers, Dealers, and Distributors of

---

[7] In this context, we use the term "right" as a synonym of "claim," as in a claim recognized by law. (Hohfeld, Fundamental Legal Conceptions (Cook ed. 1919) pp. 37–38 & fn. 32a.)

Agricultural Products), chapter 6 (Processors of Farm Products), article 9 (§§ 55631–55653) of the Food and Agricultural Code.

The producer's lien improves the position of a farmer who sells his or her farm products to a processor under an express or implied contract that provides for the processor to pay the producer later. (§ 55631; Note, *The California Agricultural Producer's Lien, Processing Company Insolvencies, and Federal Bankruptcy Law: An Evaluation and Alternative Methods of Protecting Farmers* (1985) 36 Hastings L.J. 609, 612 (*Agricultural Producer's Lien*).) The lien covers the full amount owed to the producer or, if a price or method of determining it was not set by the contract, the value of the farm product on the date of delivery. (§ 55631.) The lien attaches and is given priority upon the delivery to the processor[8] of farm product grown by the producer.[9] No further steps are required. (§§ 55632, 55633, 55635.) The lien attaches to all raw and processed forms of the farm product that have not been segregated from the producer's farm product, and it remains attached to such product while the product is in the processor's possession. (§ 55634.) The lien does not reach, and a processor may sell, product in excess of the amount owed to producers. (§§ 55631, 55638.)

### B. *Statutory Provision Concerning Proceeds of Farm Products*

#### 1. *Statutory language*

The only statutory reference to proceeds that is relevant to this case[10] is contained in the last sentence of section 55638. That section provides in full: "It is unlawful for any processor to remove, from this state or beyond his ownership or control, any farm product which is delivered to him, or any processed form of the farm product, to which any of the liens provided for in this chapter has attached, except for any of such product or processed product as may be in excess of a quantity on hand which is of a value that is sufficient to satisfy all existing liens. Furthermore, this section shall not prohibit the

---

[8] Section 55407 defines "processor," in pertinent part, as "any person that is engaged in the business of processing or manufacturing any farm product, that solicits, buys, contracts to buy, or otherwise takes title to, or possession or control of, any farm product from the producer of the farm product for the purpose of processing or manufacturing it and selling, reselling, or redelivering it in any dried, canned, extracted, fermented, distilled, frozen, eviscerated, or other preserved or processed form."

[9] Section 55408 defines "producer" as "any person that is engaged in the business of growing or producing any farm product."

[10] The only other reference to proceeds in the producer's lien statute is contained in section 55642, which authorizes the Secretary of Food and Agriculture to dispose of security deposited with the secretary pursuant to section 55641.

sale of any farm product or processed form of the product to which such a lien has attached, so long as the *total proceeds of the sale* are used to satisfy obligations to producers which are secured by a lien established pursuant to this chapter." (Italics added.)

Thus, the question whether Growers have any rights in the proceeds from the almond sales depends on the meaning given to the last sentence of section 55638.

### 2. *Legislative history*

The last sentence of section 55638 was added to the producer's lien statute as part of amendments adopted in 1979. (Stats. 1979, ch. 969, § 5, p. 3322.) In addition to allowing processors to sell farm product or its processed form so long as the total proceeds of the sale are used to satisfy obligations to producers secured by statutory liens, the 1979 amendments to the producer's lien statute eliminated a provision that limited the lien's duration to 60 days and repealed procedures that allowed a lender to obtain priority over the holder of a producer's lien by providing new value to a processor. (Legis. Counsel's Dig., Assem. Bill No. 774, 4 Stats. 1979 (Reg. Sess.) Summary Dig., p. 293.)

A California Senate Committee on the Judiciary report stated the purpose of the proposed amendments was "to insure that growers can maintain an enforceable lien on farm products delivered to canners." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 774 (1979–1980 Reg. Sess.) as amended Aug. 20, 1979, p. 1.)[11] The report also described the inadequacy of the existing structure of the producer's lien as follows:

"Proponents assert that a 60-day lien period is inadequate given the untimeliness of payments which have historically plagued the agricultural industry. Often, a grower may not know that the processor is in financial straits until long past the 60 day period.

---

[11] We grant Growers' request for judicial notice of the legislative history of section 55638 prepared by Legislative Intent Service and other materials filed on June 6, 2006, and grant Secured Lender's June 7, 2006, request for judicial notice of legislative materials labeled as exhibits A and B.

The parties have not requested judicial notice of any bills that proposed to amend the producer's lien statute after a 1998 bankruptcy court decision that addressed section 55638. No doubt, the lack of such a request occurred because of the well-established principle that failed legislation is of little value in determining the Legislature's original intent. (E.g., *Title Ins. & Trust Co. v. County of Riverside* (1989) 48 Cal.3d 84, 97 [255 Cal.Rptr. 670, 767 P.2d 1148].)

"Proponents also maintain the elimination of the procedure whereby lenders can preclude the producer's lien recognizes that a product yet unpaid for by the processor is not his to pledge away to the bank. Growers stand more or less defenseless when the processor pledges away the grower's pack, since the only thing of value that they possess to insure getting paid is their product.

"Lenders, on the other hand, can seek security interests in other assets held by the processor, i.e., real property, machinery and equipment, furniture and other fixtures. Should a processor default on a bank loan, the bank does not face financial ruin, as the grower might." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 774 (1979–1980 Reg. Sess.) as amended Aug. 20, 1979, pp. 2–3.)

Next, the report describes how opposition to the original version of the bill led to a compromise that resulted in the sentence at issue in this appeal being added to section 55638:

"When this bill was originally heard in this Committee in July, it was opposed by basically two groups: lending institutions and food processors. Opponents feared that AB 774 would eliminate inventory financing, thus seriously jeopardizing the smaller canners' ability to operate.

"However, on August 1 a meeting was held among proponents and opponents which resulted in amendments to AB 774 which removed the opposition of canners and bankers. The latest version of the bill would give growers a priority lien on their product, although any of such product in excess of the amount necessary to satisfy the total amount owed to growers under contract would be free and clear of the lien. Thus, bankers would still be able to lend to canners on their inventory when the value of the inventory exceeded the total amount of liens.

"In addition, existing . . . Sec. 55638 prohibits a processor from removing or selling any farm product delivered to him upon which a lien attaches, except any of that product as may be in excess of inventory on hand which has a value sufficient to satisfy all existing liens.

"For example, if processor X has an inventory of farm products worth $100,000, but growers A, B and C have farm product liens totalling $75,000, X is prohibited from reducing his inventory on hand below $75,000 worth of goods.

"This bill would amend Sec. 55638 to allow X to sell below the $75,000 figure, so long as the total proceeds from such sale are used to satisfy obligations to growers which are secured by lien." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 774 (1979–1980 Reg. Sess.) as amended Aug. 20, 1979, pp. 3–4.)

Based on this legislative history, we conclude that the main objective of the 1979 amendments was to see that producers would be paid for their product. Consistent with this objective, the legislative history identifies only one use for proceeds generated by the sale of farm product subject to a producer's lien—the payment of producers who hold the lien. In contrast, Secured Lender has cited and we have located no legislative materials that state or imply that proceeds (such as cash or accounts receivable) generated by the sale of farm products subject to a producer's lien are part of the collateral available to lenders with security interests.

### C. *Processor's Payment Obligation and Producer's Correlative Right*

We recognize that the United States Bankruptcy Court for the Eastern District of California has addressed the same issue of statutory construction that we address here and has held that California's statutory producer's lien does not extend to proceeds of the sale of the farm product. (*In re Sargent Walnut Ranches, Inc.* (Bankr. E.D.Cal. 1998) 219 B.R. 880 (*Sargent*).) The bankruptcy court addressed section 55638, but its discussion was based mainly on statements made by the Ninth Circuit Court of Appeals in *In re Loretto Winery, Ltd.* (9th Cir. 1990) 898 F.2d 715 (*Loretto*) and inferences drawn from those statements. (*Sargent, supra,* at pp. 884–885.) The *Loretto* decision may have caused the bankruptcy court not to analyze what legal obligations were created by section 55638 and the correlative rights associated with those obligations.

Our analysis of section 55638, however, is not constrained by the holding or analysis used in *Loretto*.[12] Instead, we will examine (1) the language used and (2) the consequences of the competing interpretations advocated by the parties to determine if those interpretations promote or frustrate the legislative purpose of the statute.[13]

---

[12] We are not bound by federal decisions on questions of state law. (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 943, p. 984.)

[13] This court has set forth the rules of statutory construction in a number of opinions and we need not reiterate those rules here. (E.g., *Coburn v. Sievert* (2005) 133 Cal.App.4th 1483, 1494–1496 [35 Cal.Rptr.3d 596]; *People v Haynie* (2004) 116 Cal.App.4th 1224, 1228–1229 [11 Cal.Rptr.3d 163]; *People v. Granite State Ins. Co.* (2003) 114 Cal.App.4th 758, 763 [7 Cal.Rptr.3d 887].)

■ What did the Legislature mean when it stated that a processor's sale of raw or processed farm product is not prohibited "so long as the total proceeds of the sale are used to satisfy obligations to producers"? (§ 55638.) Despite the awkwardness created by phrasing this provision as a condition subsequent,[14] the "plain and commonsense meaning" (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 476 [66 Cal.Rptr.2d 319, 940 P.2d 906]) of this language is clear—processors are obligated by law to use the sale proceeds to pay producers.[15]

A duty is defined as "an obligation for which somebody else has a corresponding right." (Black's Law Dict. (7th ed. 1999) p. 521.) Thus, the language in section 55638 that imposes a duty on processors simultaneously creates a right in the producer of farm product to be paid by the processor from the proceeds generated by the processor's sale of the product. (See Hohfeld, Fundamental Legal Conceptions, *supra*, at p. 36 [duty and right are correlatives].)

The bankruptcy court in *Sargent* rejected the existence of such a right by stating it would "not 'imply' a lien on proceeds or any other right or remedy not provided by the statute." (*Sargent, supra*, 219 B.R. at p. 884.) Our recognition of the producer's right to be paid from proceeds, however, is not "implied" from the statutory provisions. We merely describe the legal relationship expressly created by section 55638 from a different perspective—a perspective that uses the jural correlative of the legal obligation expressed in the statute.

Under this analysis, the producer-processor relationship concerning the proceeds can be described either (1) as the duty of the processor to apply the proceeds from the sale of farm product to pay the producer or, correlatively, (2) as the right of a producer to be paid by the processor from the proceeds generated by the processor's sale of farm product. Language that creates the

---

[14] The "so long as" language used in the last sentence of section 55638 is awkward because whether a sale is prohibited depends upon what happens after the sales transaction—whether the proceeds are used to pay producers. Thus, read literally, one cannot tell at the time of the sale if the sale is authorized or prohibited because of uncertainty over whether the condition will be satisfied sometime later. Also, we need not address the interplay between the generality of the condition subsequent language, which does not expressly limit the obligation to deliver sale proceeds to the processor, and the prevalent use within the industry of deferred payment contracts.

[15] Indeed, failure to perform this duty is penalized under other provisions of division 20, chapter 6 of the Food and Agricultural Code (Processors of Farm Products). For example, section 55872 states it is a violation for an applicant or licensee to fail to pay for farm product at the time specified in the contract or as otherwise specified by chapter 6. (See fn. 16, *post*.)

duty necessarily creates the right. Conversely, if the statute had been expressed in terms of a right to proceeds, it would necessarily have created a duty with respect to the proceeds. Because the duty is expressed plainly in section 55638 and the concept of jural correlatives is a fundamental, well-established principle of jurisprudence, recognition of the duty's jural correlative is nothing more than an application of the rule that statutory language must be given its "plain and commonsense meaning." (*Garcia v. McCutchen, supra,* 16 Cal.4th at p. 476.)

Secured Lender's arguments suggest that section 55638 does not impose an enforceable legal duty on processors with respect to use of the proceeds, but instead allows processors the choice of (1) paying the producers with the proceeds or (2) using the proceeds for other purposes and risking the civil and criminal penalties set forth in the statute. One implication of this argument is that the courts and various creditors involved must defer to the processor's choice. In other words, once the processor has implemented its decision whether or not to comply with the conditional language in section 55638, a court's power does not extend to redirecting the proceeds to the appropriate recipient but is limited to penalizing the processor in accordance with the statute.[16]

Assuming for purposes of argument that the producer's lien statute is ambiguous regarding whether a producer may bring an action to enforce the duty and correlative rights created by the last sentence of section 55638, we evaluate the merits of Secured Lender's proposed interpretation based on whether it promotes or frustrates the statutory purpose. We reject Secured Lender's statutory construction of section 55638 because it would undermine the legislative purpose of protecting producers. Allowing processors to irreversibly choose who to pay would create situations in which the optimal choice for the financially troubled processor (or those who control its actions) is to pay a particular creditor over a producer when the benefits of paying that creditor outweigh the risk of the criminal and civil penalties that might be imposed for violations of section 55638. Where, as here for example, a particular creditor has personal guarantees from the principals and officers of the processor, the benefits of reducing the personal liability under the guarantees could be greater than the potential penalties.

---

[16] The Ninth Circuit Court of Appeals described the penalties as follows: "Section 55872 adds that the processor's non-payment is a violation of the Food and Agricultural Code. Such a violation not only subjects the processor to suspension or revocation of its processor's license, § 55841, and civil penalties of up to $500 per violation, § 55922, but also constitutes a misdemeanor punishable by a fine of not less than $500 and up to $2000 and one year in the county jail, §§ 55901, 55905, 55906. These provisions fairly shout that California intends to protect producers' liens from defeat." (*Loretto, supra,* 898 F.2d at p. 722, fns. omitted.)

■ In summary, the meaning of the last sentence of section 55638 is clear. Processors have a legal duty to use the proceeds from the sale of farm product subject to a producer's lien to pay the producer, and the producer has the right to be paid with those proceeds.

## II. *Priority of Producer's Rights to the Proceeds from Farm Product*

The next question is whether Growers' rights to be paid from the proceeds of almond sales are superior to the security interest held by Secured Lender. Existing precedent does not provide a direct answer.

### A. *Producer's Rights in Proceeds Meet the Definition of a Lien*

The first step in our analysis of priority is to determine whether a producer's right to be paid by the processor from proceeds generated by the sale of raw or processed farm product should be characterized as a lien.

■ The producer's lien statute does not itself define the terms "lien" or "producer's lien." Generally, the term "lien" is defined as a "legal right or interest that a creditor has in another's property, lasting usu. until a debt or duty that it secures is satisfied." (Black's Law Dict., *supra*, p. 933; cf. Civ. Code, § 3439.01, subd. (f) ["lien" defined in Uniform Fraudulent Transfer Act].)

■ Applying this definition of lien to the facts of this case, we conclude that the legal right of Growers to be paid by Processor from the sales proceeds can be characterized as a lien. Growers are creditors of Processor, Processor holds property interests in the proceeds, and nothing in the statute terminates Growers' right to be paid from the proceeds (or its correlative, Processor's legal obligation to pay) before the debt Processor owes Growers is satisfied. Therefore, we conclude a producer's right to be paid from the proceeds constitutes a lien on the proceeds.

### B. *Producer's Rights in Proceeds Have Priority Under Section 55633*

The second step in our analysis concerns whether the producer's right to be paid by the processor from proceeds generated by the sale of raw or processed farm products, which we have characterized as a lien, is a "producer's lien" for purposes of the priority provisions set forth in section 55633. "The producer's lien is a preferred lien prior in dignity to all other liens, claims, or encumbrances except" for certain wage and salary claims for labor provided to the processor and certain liens of warehousemen. (§ 55633.)

There are three ways the producer's lien statute could have dealt with the question whether the right of a producer to be paid from sale proceeds is part of the "producer's lien." The statute could have expressly included the right in the producer's lien or expressly excluded it; or, as is actually the case, it could have failed to address the question.

The question is answered, however, by a straightforward application of the terms. The rights are a lien on the proceeds; those rights are held by producers; therefore, the rights are literally a "producer's lien."

■ This construction of the statute must be examined to confirm that it promotes rather than frustrates legislative purpose and that it does not produce absurd consequences. (*Coburn v. Sievert, supra,* 133 Cal.App.4th at p. 1495.)

■ The Legislature has stated that the purposes of the Food and Agricultural Code are "promoting and protecting the agricultural industry of the state" and "protect[ing] the public health, safety, and welfare." (§ 3.) To accomplish these purposes, its provisions "shall be liberally construed." (*Ibid.*) Based on these general statements of purpose and, as well, on the enforcement and punitive measures provided in the Food and Agricultural Code, this court previously has stated that the Legislature clearly intended that " 'producers shall be assured full payment for their farm products.' " (*McKee v. Bell-Carter Olive Co.* (1986) 186 Cal.App.3d 1230, 1237 [231 Cal.Rptr. 304].) Furthermore, as we concluded earlier, the purpose of the 1979 amendments was to see that producers would be paid for their product. (See pt. I.B.2, *ante.*) Stated otherwise, the 1979 amendments to the producer's lien statute enacted changes "to strengthen the position of farmers as against lenders to the processor." (*Agricultural Producer's Lien, supra,* 36 Hastings L.J. at p. 613.)

We conclude that a construction that treats a producer's claim to the proceeds as a "producer's lien" entitled to priority under section 55633 promotes the general purposes of the producer's lien statute as well as the 1979 amendment's specific purpose of seeing that producers would be paid for their product. In contrast, adopting Secured Lender's statutory constructions would frustrate the statutory purpose of the 1979 amendments and create an anomaly.

To illustrate the drawbacks of the alternative statutory constructions suggested by Secured Lender, we begin by applying those constructions to the factual situation in which the processor has complied with the directive in section 55638 and paid the proceeds to the producer.

The first statutory construction recognizes that a producer may have rights to sale proceeds but concludes that those rights are never given priority by the producer's lien statute. Therefore, a secured creditor's security interest, which attaches to the proceeds the moment the processor acquires rights in the proceeds, always is superior to any producer's claim to the proceeds. Consequently, if a processor obeys the directive in section 55638 and uses sale proceeds to pay producers, the secured creditor could recover those proceeds from the producers in a lawsuit enforcing its security interest. (See *Imperial NH3 v. Central Valley Feed Yards, Inc.* (1977) 70 Cal.App.3d 513 [139 Cal.Rptr. 8] [creditor's refusal to honor superior claim of secured creditor to proceeds of hay crop constituted conversion].) Under this statutory construction, the directive of section 55638 would be anomalous, for it would make little sense to require that the processor pay the proceeds to the party with the inferior rights.

To avoid this anomaly, Secured Lender suggests an alternative construction that, when the processor obeys the directive in section 55638 and pays sale proceeds to a producer, a secured party could not undo that payment by enforcing its security interest in the proceeds. Two problems arise from this statutory construction. First, counsel for Secured Lender has offered no conceptual basis for why a security interest that has attached to proceeds is no longer enforceable when the proceeds are delivered to producers. Second, the practical effect of this construction is that it gives the processor the power to irreversibly choose who gets to keep the proceeds. As discussed earlier, such an irreversible choice promotes no statutory purpose. Rather, it undermines the statutory purpose of promoting the agricultural industry because it increases the uncertainty for both the producer and the lender due to the difficulty in predicting which one the processor will choose to pay.

In addition to the foregoing, the drawbacks of the alternative statutory constructions suggested by Secured Lender can be illustrated by the factual situation in which the processor has violated the directive in section 55638 and paid the proceeds to a secured creditor.[17] Because neither construction gives *priority* to a producer's claim to the proceeds, they eviscerate much of the protection given to producers by the directive of section 55638 that proceeds be used to pay producers. Under the view that a producer's claim to the proceeds is not a "producer's lien" given priority by section 55633, producers could not successfully sue and recover the proceeds from a secured lender that has received them. Consequently, (1) producers would receive

---

[17] In this factual scenario, which is the one presented in this case, the deterrent effect of the threat of monetary, licensing, and criminal sanctions proved illusory in the face of economic incentives to ignore the directive. (See fn. 4, *ante.*)

no protection from the last sentence of section 55638 in the situation where they are most at risk—where the processor is having financial difficulties and is unable to pay a creditor with a security interest in proceeds—and, (2) producers would receive the greatest protection in a situation where it is unlikely to be needed—where the processor does not owe money to a creditor with a security interest that covers proceeds from the sale of inventory.

 In summary, a statutory construction that grants priority to a producer's claim to sale proceeds (1) promotes the purpose of the producer's lien statute by reducing the risk that producers will not be paid for product that they sell to processors on credit and (2) does not produce an absurd result. Accordingly, the producer's right to be paid from the proceeds of the sale of raw or processed farm product is a "producer's lien" for purposes of the priority provisions of section 55633. Therefore, we conclude Growers' claims to the proceeds have priority over Secured Lender's security interest.

### C. *Other Arguments*

Secured Lender argues the Legislature did not intend to give producers a lien on proceeds because it did not use language similar to that used in other statutes that have created liens on proceeds. In 1979, for example, the Legislature defined a livestock producer's lien by stating that "any person who sells . . . livestock to a meatpacker, shall have a lien . . . upon the identifiable proceeds . . . for the unpaid part of the purchase price . . . ." (§ 55702, subd. (a); see § 57510 [liens upon the proceeds of sale of eggs, poultry, and fish].) Secured Lender supports this argument by citing *Sargent*. (See *Sargent*, *supra*, 219 B.R. at p. 884 [comparing the language of § 55638 to that of § 55702].)

Secured Lender's argument is not convincing because it fails to recognize that the Legislature might express a lien right to proceeds in terms of its jural correlative. Furthermore, the difference in language used in the two lien statutes is explained in part by the process that led to their enactment. Article 10.5 of chapter 6, division 20 of the Food and Agricultural Code, which contains the provisions concerning the producer's lien on livestock sold to a meatpacker, was enacted as a single, integrated piece of legislation in 1979. In contrast, the sentence in section 55638 that addresses proceeds was added as part of a revision of a bill that proposed amending the producer's lien statute. That sentence reflected a political compromise rather than the work of a single drafter writing an entire article on a blank slate. Thus, it is an unrealistic view of the legislative process to expect (much less, to require) the use of parallel language to define the relationship between the producer and processor as it concerns sale proceeds.

Secured Party argues that treating a producer's right to the proceeds as a "producer's lien" for purposes of the statute will send the system of agricultural lending into disarray by making it difficult for banks to assess the risk of lending to processors. The prediction of disarray is not convincing because it is based on an assumption that many financial institutions rely on product inventory (or at least the proceeds generated by that inventory) that is subject to producers' liens when lending to processors. Secured Lender has not shown that this assumption is justified. Thus, as far as we know, it is just as—or more—common that lenders insist processors obtain lien releases from producers where lenders want to rely on a processor's product inventory as collateral before making their loans. (See *Agricultural Producer's Lien, supra*, 36 Hastings L.J. at pp. 614–615 [describing the prevalent use of such lien releases after the 1979 amendments to the producer's lien statute and an unsuccessful legislative attempt by farming interests to repeal the provision that authorizes the use of lien releases]; see *In re T.H. Richards Processing Co.* (9th Cir. 1990) 910 F.2d 639 [interpreting language in § 55637 governing releases].) Therefore, we cannot accept Secured Lender's assumption that many loans have been made to processors in reliance on the proceeds to be generated from product inventory that is subject to producer's liens.

In addition, to the extent that some financial institutions may have lent to processors in reliance on the theory that inventory subject to a producer's lien would generate proceeds and that those proceeds would be subject to their prior security interests, they chose a risky course. First, this course is not one contemplated in the legislative history that discussed the collateral available to banks that lend to processors. The prudent banker should rely on product in a processor's inventory only to the extent that product is "free and clear of such lien."[18] (§ 55631.) Second, a bank that relies on *proceeds* from inventory subject to a producer's lien is betting that (1) the producers will not enforce their lien on the product itself before it is sold and generates proceeds and (2) the processor will violate the directive in section 55638 that the proceeds are to be used to pay producers.[19]

In short, our decision not to follow *Sargent* and to hold that the producer's lien covers proceeds from the sale of farm product adds merely a slight increment to the risk taken by lenders that chose the already risky course of relying on proceeds generated by product inventory that was subject to a

---

[18] The legislative history for the 1979 amendments that added this language to section 55631 stated that "bankers would still be able to lend to canners on their inventory when the value of the inventory exceeded the total amount of liens." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 774 (1979–1980 Reg. Sess.) as amended Aug. 20, 1979, p. 3.)

[19] Alternatively, such a bank may have construed the statute to mean that its security interest in the proceeds remained in effect even if the directive in section 55638 was followed and the funds were paid to producers. Even if this statutory construction had been correct, the bank still risked having to pursue litigation to recover the proceeds from the producers.

producer's lien. Thus, we reject Secured Lender's contention that this decision profoundly alters the risk of lending to processors and the ability of lenders to assess that risk and are unconvinced by the related prediction that it will throw agricultural lending into disarray.

## III. *Demurrer*

### A. *Conversion*

 Based on the conclusion that Growers held a prior lien on the almond sale proceeds, we conclude that Growers have pled facts sufficient to state a cause of action for conversion of proceeds from almond sales. California recognizes conversion as a cause of action that a creditor with a superior claim to collateral may state against another creditor that has possession of the collateral. (See *Imperial NH3 v. Central Valley Feed Yards, Inc., supra*, 70 Cal.App.3d 513 [creditor's refusal to honor superior claim of another creditor to proceeds of hay crop constituted conversion].)

### B. *Unfair Competition Law*

#### 1. *Sufficiency of allegations*

Growers also have pled facts sufficient to state a cause of action for an unfair business practice in violation of the unfair competition law insofar as that legal theory seeks the restitution of almond sale proceeds in which Growers' claims have priority.

#### 2. *Secured Lender is not a public entity*

Secured Lender contends that public entities are not subject to suit under the unfair competition law and that, as a federal instrumentality, it should be regarded as a public entity for purposes of that statute. We have assumed that Secured Lender is a production credit association and thus is a federally chartered instrumentality of the United States.

 When the Farm Credit Administration[20] approves a production credit association's articles of association and issues a charter, the production credit association becomes "a federally chartered body corporate and an instrumentality of the United States." (12 U.S.C. § 2071(b)(7).) Each production credit

---

[20] The Farm Credit Administration is a federal agency. Specifically, it is an independent agency in the executive branch of the federal government. (12 U.S.C. § 2241.) It regulates the federal Farm Credit System, and its duties include chartering and regulating production credit associations. (*Nelson v. Farm Credit Services of North Dakota* (D.N.D. 2005) 380 F.Supp.2d 1061, 1067–1068.)

association is a "body corporate," and its general corporate powers include the power to "sue and be sued." (12 U.S.C. § 2073(4).)

Secured Lender has cited no opinion from California or any other jurisdiction that treats a production credit association as a public entity under state law. In other contexts, production credit associations are not treated as public entities. For instance, the Supreme Court of Kansas has held that production credit associations are subject to state income tax even though they are chartered, organized, and operated under federal law as part of the Farm Credit System. (*In re Farm Credit Services of Central Kan.* (2001) 271 Kan. 805 [26 P.3d 695].) For jurisdictional purposes, federally chartered bodies corporate are "considered corporations of the state in which they conduct ordinary business." (*CFSC Consortium, LLC v. Ferreras-Goitia* (D.P.R. 2002) 198 F.Supp.2d 116, 120, fn. 7.)

 Secured Lender has pointed to nothing in the statutory text or extrinsic legislative materials to indicate the California Legislature intended to treat production credit associations in particular, or federally chartered corporations or associations in general, as public entities for purposes of the unfair competition law. Rather, corporations and associations are included in the statutory definition of "persons" contained in Business and Professions Code section 17201.

According to the declaration of the loan officer of Secured Lender who handled Processor's line of credit, the first disbursement under the line of credit was used to pay off Processor's preexisting operating loan from California Federal Bank. Consequently, in some ways, Secured Lender is competing with other lenders in the business of agricultural lending.

We conclude that Secured Lender is a "person" and not a public entity for purposes of the unfair competition law. As a result, Secured Lender is subject to suit under Business and Professions Code section 17200. Imposing liability on Secured Lender is not the same as imposing liability on an entity of the federal government functioning in a nonbusiness, noncompetitive role.

IV. *Summary Judgment**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 1263.

## DISPOSITION

The judgment is reversed. The matter is remanded to the superior court with directions (1) to vacate its May 10, 2004, order sustaining the demurrer as to the third and fifth causes of action and enter an order overruling the demurrer in its entirety; (2) to vacate its March 17, 2005, order granting summary judgment and enter an order denying that motion; and (3) to enter an order granting summary adjudication as to the first cause of action, which was labeled "intentional interference with economic relations."

Plaintiffs are awarded costs on appeal.

Vartabedian, Acting P. J., and Gomes, J., concurred.

Respondent's petition for review by the Supreme Court was denied October 11, 2006, S146406. Kennard, J., and Moreno, J., were of the opinion that the petition should be granted.