[No. F049143. Fifth Dist. Jan. 9, 2007.]

N.L. NEILSON, Plaintiff and Appellant, v.
CITY OF CALIFORNIA CITY et al., Defendants and Respondents.
ASSOCIATION FOR LEGAL DESERT DEVELOPMENT et al., Plaintiffs and Appellants, v.
CITY OF CALIFORNIA CITY et al., Defendants and Respondents.

Counsel

Kane, Ballmer & Berkman, Murray O. Kane, June Ailin and Donald P. Johnson for Plaintiffs and Appellants.

Motschiedler, Michaelides & Wishon and C. William Brewer for Won Gin Ng and Rose Ng as Amici Curiae on behalf of Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Tom Greene, Chief Assistant Attorney General, J. Matthew Rodriguez, Assistant Attorney General, and Daniel L. Siegel, Deputy Attorney General, for Bill Lockyer, Attorney General of the State of California, as Amicus Curiae on behalf of Plaintiffs and Appellants.

Bernard C. Barmann, Sr., County Counsel (Kern) and Stephen D. Schuett, Assistant County Counsel, for County of Kern as Amicus Curiae on behalf of Plaintiffs and Appellants.

Price, Postel & Parma, Todd A. Amspoker, Mark S. Manion; Kuhs & Parker, Robert G. Kuhs; and R. Bruce Tepper for Defendants and Respondents.

Opinion

**DAWSON, J.**—Appellants challenged the validity of redevelopment plan amendments adopted by respondents City of California City (City) and City of California City Redevelopment Agency (Redevelopment Agency) that resulted in the building of an automobile test track facility on desert land. Appellants claim Redevelopment Agency erroneously determined that the 24.4 square miles of vacant land added to the redevelopment area was urbanized and blighted within the meaning of California's Community Redevelopment Law (CRL) (Health & Saf. Code, § 33000 et seq.).[1] As a result, appellants contend, the land was improperly included in the redevelopment area.

Redevelopment Agency found the land was urbanized and blighted based on "[t]he existence of subdivided lots of irregular form and shape and inadequate size for proper usefulness and development that are in multiple ownership." (Former § 33031, subd. (a)(4).)[2] Appellants contend that Redevelopment Agency misconstrued and misapplied the statutory terms

---

[1] All further statutory references are to the Health and Safety Code unless otherwise indicated.

[2] Further references to section 33000 et seq. are to the version in effect until January 1, 2007.

"irregular form and shape" and "inadequate size." Specifically, appellants argue that the statutory conditions concerning a lot's "irregular form and shape" and its "inadequate size" cannot both be satisfied by the lot's lack of access to a right-of-way. Thus, the primary issues addressed in this opinion are questions of statutory construction.

We conclude that Redevelopment Agency interpreted the statute errone-ously when it found that the lack of legal and physical access to a right-of-way meant the subject lots were of irregular form and shape. Such an interpretation does not reflect the usual and ordinary meaning of the words used in the statute. For instance, providing access to a lot would not, in the ordinary sense of the words, change the "form and shape" of the lot. Because Redevelopment Agency's findings were based on an incorrect interpretation of the statute, its approval of the redevelopment plan is invalid. Judgment is reversed.

## FACTS AND PROCEEDINGS

This appeal involves two cases that were consolidated for trial by the superior court. In *Neilson v. City of California City* (Super. Ct. Kern County, 2003, No. 248874) (Case No. 248874),[3] N.L. Neilson brought a reverse validation action[4] pursuant to Code of Civil Procedure section 860 et seq. challenging the second amendment to the City redevelopment plan (hereafter Second Amendment) adopted by Redevelopment Agency on October 29, 2002. Case No. 248874 was filed on December 11, 2002.

In *Association for Legal Desert Development v. City of California City* (Super. Ct. Kern County, No. 251026) (Case No. 251026), the plaintiffs filed a second reverse validation action and challenged the validity of the third amendment to the City redevelopment plan (hereafter Third Amendment) adopted by Redevelopment Agency on July 17, 2003. Case No. 251026 was filed in August 2003.

---

[3] This case was the subject of a prior appeal to this court. (*Neilson v. City of California City* (Mar. 3, 2004, F043173) [nonpub. opn.].) In that appeal, we reversed a judgment of dismissal entered after the superior court sustained a demurrer without leave to amend on the ground that Mr. Neilson did not have standing to sue. We concluded that Mr. Neilson had standing to sue and that the interveners in the action should have been given an opportunity to amend their pleading to allege futility with respect to their failure to exhaust their administrative remedies.

The consolidated cases and the present appeal are not related to *Neilson v. City of California City* (2005) 133 Cal.App.4th 1296 [35 Cal.Rptr.3d 453]. In that case, Mr. Neilson unsuccess-fully raised constitutional challenges to a $75 flat-rate parcel tax imposed by City.

[4] Actions by parties other than a public agency, brought to determine the validity of an action taken by a public agency, are generally called " 'reverse validation action[s].' " (*Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 922 [100 Cal.Rptr.2d 173].)

A 24-volume administrative record was filed in the consolidated action on November 4, 2004. The administrative record contains 249 documents totaling 5,633 pages and is accompanied by a certification of administrative record signed by the city clerk for City, who was also the secretary for Redevelopment Agency.[5]

*Project & Chronology*

In January 2002, Hyundai America Technical Center, Inc. (Hyundai), and City entered a memorandum of understanding so that Hyundai could evaluate the acquisition and development of vacant land for the purpose of building an automobile test track. Because some of the land was outside the city limits, City was to apply to annex the land where the test track would be built.

In June 2002, Hyundai and City entered a memorandum of agreement regarding the proposed test track facility.

In July 2002, a draft environmental impact report (EIR) was issued that stated the proposed project had four components: "(1) the expansion of the existing City redevelopment area; (2) the detachment of three disjunct parcels of land from the City into the unincorporated area of the County; (3) the annexation of land from the unincorporated area of the County into the corporate boundaries of the City; and (4) the construction and operation of an automotive test course within the land to be annexed into California City's corporate boundaries."

The draft EIR states the proposed expansion of the existing redevelopment area was to include 8,168 acres (approximately 12.8 square miles) located within City's boundaries and 7,466 acres (approximately 11.7 square miles) located in Kern County (County). The redevelopment area would be expanded to City's western boundary, which is formed by State Highway 14. The land use regulations and zoning districts for the County land added to the redevelopment area were to be changed to be comparable to City's designations, except for the areas proposed for the test track facility.

The area to be detached from City consisted of three separate areas totaling 18,440 acres (approximately 28.8 square miles). The largest area to be detached consisted of 12,450 acres along the northern edge of City in its northeast corner.

---

[5] Prior to consolidation of Case Nos. 248874 and 251026, a five-volume record of proceedings was filed in Case No. 251026. The five volumes contain 49 separately indexed documents that total 1,162 pages as well as a "certification of administrative record" dated December 5, 2003. It appears that most, if not all, of the documents in the five volumes also are included in the 24-volume administrative record filed in the consolidated action.

The area to be annexed by City consisted of 18,778 acres (approximately 29.3 square miles) of vacant land located in the unincorporated area of Kern County. The annexation area was located on the southwest side of City and would extend City's boundaries far enough south to reach State Highway 58.

As proposed in the draft EIR, the test course facility involved the development of 4,340 acres (approximately 6.78 square miles) of vacant desert land. The facility would test prototype and production-type vehicles and would have a year-round staff of approximately 35 to 40 employees that could reach a peak of 50 to 65 employees during a one-month peak period of hot weather testing during the summer.

The proposed facilities included a six-mile oval course, a loop track, a two- to three-mile winding track located inside the oval course, a vehicle dynamics area,[6] paved hill roads, a 24,000-square-foot support building, a 50-space parking lot, a fuel storage area, and a car wash. Approximately 100 acres of the site would be reserved for future development. The facility would be connected to State Highway 58 by an access road approximately two miles long. Also, a water line approximately two miles long would be built straight west from an existing tie point. That water line would reach the northeast corner of the site of the test track facility and would follow the Joshua Boulevard alignment, then an unimproved dirt road.

Redevelopment Agency retained the consulting firm of Katz Hollis to prepare a report to the city council on the Second Amendment. Katz Hollis finalized the report in October 2002. The report concluded that the area to be added to the redevelopment area was a blighted area because it was "characterized by lots of irregular form and shape and/or inadequate size for their intended use and lots that are not accessible from public rights-of-way connected to the network of rights-of-way providing circulation and utilities in the City." After quoting four dictionary definitions of "irregular," the report stated: "In the case of properties comprising the Second Amendment Area the 'law', 'general rule', 'standard', 'custom' or 'pattern' that renders most parcels in the Second Amendment Area irregular is the requirement that development may not occur on a parcel of land that does not have legal and physical access to a public right-of-way. . . . [¶] As applied to the properties of the Second Amendment Area, irregular refers to the lack of legal and physical access resulting from the subdivision pattern of the parcels."[7]

---

[6] The area was proposed as a 250-foot-wide and 5,000-foot-long asphalt strip constructed inside the oval course and parallel to its southeast straightaway.

[7] This quote provides some insight into Redevelopment Agency's misinterpretation of the statutory language. It states that the parcels were rendered irregular and does not specifically discuss "form and shape."

The report also described the process used to identify the lots that met the definition used for "irregular form and shape": "The identification of lots of irregular form and shape conducted for purposes of this Report was done through a review of Kern County Assessor records and review of parcel maps filed within the Second Amendment Area. All rights-of-way shown on the Assessor's maps and on the parcel maps were noted and all parcels having access to these rights-of-way were designated 'regular' parcels. Next, using Assessor tax roll information, all property owners of more than one parcel of land in the Second Amendment Area were identified. Where such common ownership involved one or more parcels that abutted a 'regular' parcel, the abutting parcel(s) was also designated 'regular'. Thus, the parcels remaining, the irregular parcels, are those that do not have access to a public right-of-way neither directly nor by reason of having common ownership with an adjacent parcel with access to a public right-of-way."[8]

On October 29, 2002, the Second Amendment was adopted, as Ordinance No. 02-602, under the provisions of California's CRL. The Second Amendment required the deannexation from City to County of approximately 29 square miles, the annexation to City of a nearly equal amount of unincorporated County land, and the expansion of the redevelopment project area by approximately 15,634 acres.

Also on October 29, 2002, City adopted Ordinance No. 02-603, which "pre-zoned" the site for the test track as "Light Industrial and Research" and the area surrounding the site as "Controlled Development, Public Parks and Recreation, or Public Schools."

In December 2002, Hyundai acquired about 80 percent of the 4,340-acre site for the test track facility in a single transaction with a railroad.

In March 2003, Redevelopment Agency and Hyundai entered an "Owner Participation Agreement" with respect to the site for the test track facility. Under that agreement, Redevelopment Agency agreed to acquire parcels that were part of the proposed site for the test track facilities and not owned by Hyundai. Redevelopment Agency could acquire the parcels through negotiations or its power of eminent domain.

The Third Amendment was adopted on July 17, 2003, and added the tax increment financing mechanism to the powers given Redevelopment Agency under the Second Amendment. (See Cal. Const., art. XVI, § 16; § 33670.) Redevelopment Agency referred to the findings of blight previously made in

---

[8] Again, as mentioned in footnote 7, *ante*, the quoted language refers to regular and irregular parcels, not the regular or irregular "form and shape" of those parcels.

Ordinance No. 02-603 and found that "significant blight remains in the project area, and such blight cannot be eliminated without utilizing tax increment financing." It also found that the "condemnation of real property in the Project Area, as stated in the Redevelopment Plan, is necessary to the execution of the Redevelopment Plan . . . ."

*Hearing and Judgment of Superior Court*

The consolidated cases were heard on September 20, 2005, and the superior court issued its order from the bench that same day. The superior court determined that substantial evidence supported Redevelopment Agency's finding that 80 percent of the land in the project area consisted of subdivided lots that were of irregular form and shape and inadequate size for proper usefulness and development and that were in multiple ownership. The superior court also determined that substantial evidence supported Redevelopment Agency's finding that the Third Amendment was economically feasible. Based on these determinations, the superior court declared the Second and Third Amendments valid.

Judgments were entered in Case Nos. 248874 and 251026 on October 6, 2005.

Less than two weeks later, appellants filed notices of appeal from the judgments validating the Second and the Third Amendments.

*Amici Curiae on Appeal*

The Attorney General has filed an amicus curiae brief in support of appellants. The brief asserts that (1) the Attorney General has a strong interest in upholding the integrity of state statutes; (2) the state has a strong interest in the proper application of its redevelopment law; (3) redevelopment under the CRL should be limited to revitalizing decaying areas that are causing a serious physical and economic burden on the community; and (4) Redevelopment Agency abused the CRL when it "designated thousands of acres of bare, undeveloped land in the middle of the desert as blighted" and included the land in the redevelopment project area.

Won Gin Ng and Rose Ng filed an amici curiae brief in support of appellants. Dr. and Mrs. Ng are condemnee-landowners in one of Redevelopment Agency's eminent domain actions. Their brief asks this court to consider (1) whether Redevelopment Agency's adoption of its resolution of necessity was a sham because it had committed itself to taking the subject properties by eminent domain regardless of the evidence presented at the hearing and (2) whether Redevelopment Agency's implementation of its

obligations under the memorandum of understanding, memorandum of agreement, and owner participation agreement rendered a disclaimer in the owner participation agreement ineffective. Because the underlying judgment is reversed on other grounds, we do not reach the questions raised in the brief of Dr. and Mrs. Ng and deny their request for judicial notice.

County filed an amicus curiae brief in support of respondents. The brief asserts that County has a compelling interest in remedying blight within its boundaries. It references the many inaccessible 2.5-acre lots in the affected area that cannot be developed because creating access is cost prohibitive as well as "[t]he 40-year history of virtually no development and high tax default rates within the [Second] Plan Amendment Area." County challenges the Attorney General's assertion that the redevelopment project is a "poster child" of redevelopment abuse. In County's view, this description unduly trivializes the problems local government must address as the result of a land fraud scheme that prematurely subdivided and landlocked desert parcels to such an extent that subsequent development of the land could not occur were the power of eminent domain not used to bring order out of chaos. County also points out that reversing the superior court's decision would be very disruptive because the test track facility has been built and millions of dollars invested.[9]

## DISCUSSION

### I. *Standard of Review*

The findings of a redevelopment agency regarding urbanization and blight are reviewed by an appellate court to determine whether the administrative record contains substantial evidence that supports those findings; this review is done independent of any determinations made by the superior court. (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 674 [125 Cal.Rptr.2d 745]; *Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency* (2000) 82 Cal.App.4th 511, 537 [98 Cal.Rptr.2d 334] [project area not characterized by any of the statutory conditions that cause physical blight].) "[T]he reviewing court must resolve reasonable doubts in favor of the administrative findings and determination." (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco, supra,* at p. 674.) For instance, where conflicting inferences can be drawn from the evidence, we accept all reasonable inferences supporting the administrative findings. (*Ibid.*)

---

[9] Hyundai chose to build the facility knowing that the judgment in the consolidated cases was not final. Generally, when a party to litigation decides to proceed with a project before the judgment in that litigation is final, that party has assumed the risk of reversal. (E.g., *Woodward Park Homeowners Assn. v. Garreks, Inc.* (2000) 77 Cal.App.4th 880, 890 [92 Cal.Rptr.2d 268].)

A redevelopment agency's interpretations of California's CRL are not given the same deference that its findings of fact receive under the substantial evidence standard. (E.g., *Boelts v. City of Lake Forest* (2005) 127 Cal.App.4th 116, 126–133 [25 Cal.Rptr.3d 164] [interpreting provisions of CRL].) Instead, issues of statutory construction raise pure questions of law that are subject to independent appellate review. (*Redevelopment Agency v. County of Los Angeles* (1999) 75 Cal.App.4th 68, 74 [89 Cal.Rptr.2d 10].)

## II. *Blight and Urbanization*

■  Redevelopment agencies are authorized to combat blight using three extraordinary powers—the diversion of property taxes that otherwise would have gone to the state or other government entities; the use of public funds to subsidize private enterprise; and the power of eminent domain. (§§ 33391, subd. (b) [eminent domain], 33430 & 33670 [tax increment financing]; *City of El Monte v. Commission on State Mandates* (2000) 83 Cal.App.4th 266, 269–272 [99 Cal.Rptr.2d 333] [background of tax increment financing]; see Lefcoe, *Finding the Blight That's Right for California Redevelopment Law* (2001) 52 Hastings L.J. 991, 1005–1006; Tepper, *A Thousand Points of Blight* (Mar. 2001) 24 L.A. Law. 34.)

### A. *Statutory Background*

■  The redevelopment powers granted under the CRL may be invoked by local government when an area meets the statutory definitions of "predominantly urbanized" and "blighted." (§§ 33030, 33320.1; see § 33031.)

■  Here, Redevelopment Agency determined the project area was urbanized and blighted for purposes of the CRL based on only one statutory provision—subdivision (a)(4) of section 33031 (hereafter section 33031(a)(4)). Under section 33031(a)(4), the physical conditions that cause blight include "[t]he existence of subdivided lots of irregular form and shape and inadequate size for proper usefulness and development that are in multiple ownership." Respondents refer to this provision as describing a type of blight involving "prematurely subdivided lots" and "antiquated subdivisions."[10]

---

[10] Respondents seem to assume that if the label "antiquated subdivision" can be applied to an area, then it logically follows that the area falls within the statutory definition of blight contained in section 33031(a)(4). This reasoning is flawed because blight is only one of "at least 11 different types of antiquated subdivisions." (Sen. Com. on Local Government, California's Hidden Land Use Problem: The Redevelopment of Antiquated Subdivisions, A Background Staff Report of an Interim Hearing of the Subcommittee on the Redevelopment of Antiquated Subdivisions (Dec. 2, 1986) pp. 16–19.) Thus, section 33031(a)(4) addresses only the type of antiquated subdivision that meets the particular requirements of that provision.

## B. *Issues of Statutory Construction*

Respondents' reliance on section 33031(a)(4) has raised a number of issues about the meaning of its terms. For example, how should the term "subdivided lots" be defined and, once defined, how does the chosen definition apply to the land in the project area? What is an "irregular form and shape"? Is the "inadequate size" requirement met because a lot does not have access to a right-of-way? These issues of statutory interpretation were not discussed in *Beach-Courchesne v. City of Diamond Bar* (2000) 80 Cal.App.4th 388, 405 [95 Cal.Rptr.2d 265], a case where the Court of Appeal held that there was no substantial evidence to support the finding of blight pursuant to section 33031(a)(4).

This court has set forth the rules of statutory construction in a number of opinions. (E.g., *Coburn v. Sievert* (2005) 133 Cal.App.4th 1483, 1494–1496 [35 Cal.Rptr.3d 596]; *People v. Haynie* (2004) 116 Cal.App.4th 1224, 1228–1229 [11 Cal.Rptr.3d 163]; *California Teachers Assn. v. Governing Bd. of Hilmar Unified School Dist.* (2002) 95 Cal.App.4th 183, 191 [115 Cal.Rptr.2d 323].) We do not expound on those rules at length here because they are not a source of controversy in this appeal. (*Frazier Nuts, Inc. v. American Ag Credit* (2006) 141 Cal.App.4th 1263, 1274, fn. 13 [46 Cal.Rptr.3d 869].)

To summarize those rules, the goal of statutory construction is to effectuate the purpose of the statute. (See *Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196].) The first step is to look to the words used by the Legislature and give them their usual, ordinary meaning. (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 476 [66 Cal.Rptr.2d 319, 940 P.2d 906].) Generally, the analysis of statutory language ends once a court has determined that the words used are clear and unambiguous. (*Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 775 [72 Cal.Rptr.2d 624, 952 P.2d 641] [judicial construction is generally unnecessary where statutory language is clear and unambiguous, i.e., has only one reasonable construction].)

## C. *"Irregular Form and Shape" Requirement and Lot Access*

Respondents argue that "irregular" means " 'not conforming to the standard of law, propriety, method or custom, lacking an established pattern.' "[11]

---

[11] A definition of "irregular" in Webster's Third New International Dictionary (1986) that is specifically related to form states, "**3 a :** lacking perfect symmetry of form : not straight, smooth, even, regular <a rough~terrain> <a long~coastline> . . . ." (*Id.* at p. 1196; see *Martinez v. Enterprise Rent-A-Car Co.* (2004) 119 Cal.App.4th 46, 54, fn. 3 [13 Cal.Rptr.3d 857] [courts may obtain ordinary and usual meaning of words from dictionary].) We need not

Applying this definition, respondents contend most of the parcels in the Second Amendment area are rendered "irregular" by " 'the requirement that development may not occur on a parcel of land that does not have legal and physical access to a public right-of-way.' "

Assuming for purposes of argument that "irregular" was used by the Legislature to mean " 'not conforming to [a] standard of law,' " respondents' application of this interpretation is flawed because the adjective "irregular" is used to modify only the "form and shape" of the subdivided lots referenced in the statute. In other words, regardless of the definition of "irregular," the statute is unambiguous in that "irregular" modifies "form and shape." "Irregular" does not modify the lot itself and does not modify any characteristics of a subdivided lot except its "form and shape."

■ Therefore, the question presented by respondents' interpretation of "irregular" is whether legal and physical access to a right-of-way affects the lot's "form and shape." One way to analyze this question is to ask whether providing access to the lot would, in the ordinary and usual meaning of the words, change the "form and shape"[12] of the lot. Because a lot's configuration or spatial contour is not altered when access to the lot is obtained, we conclude that access is not a characteristic that determines whether a lot's form and shape is regular or irregular. In other words, the *lot itself* might be deemed irregular under applicable standards of law if it does not have physical and legal access to a right-of-way, but that irregularity does not affect the lot's *form and shape*.

Respondents argue there is no pattern to the size and shape of the lots and give an example of a 480-acre lot adjacent to lots of six different sizes, ranging from 2.5 acres to 320 acres. Based on the lack of a pattern, respondents contend the shape and size of the lots are irregular. We conclude that the varying lot acreage concerns only the *size* of the lots and not their shape, which is rectangular.

■ Accordingly, Redevelopment Agency's determination that the rectangular lots in the project area were of irregular form and shape is based on an erroneously broad interpretation of the statute. Because Redevelopment

---

address whether "irregular" was used in the statute in this more limited sense or whether the Legislature intended "irregular" to include conformance to standards of law.

[12] Form and shape are synonyms of one another, but are not necessarily identical terms. The synonyms of "form" listed in Webster's Third New International Dictionary, *supra,* at page 892, include figure, shape, conformation and configuration. "Shape" is defined as "**1 a :** the visible makeup characteristic of a particular item or kind of item : characteristic appearance or visible form . . . **b** (1): spatial form or contour that is usu. fixed by a relatively constant spatial relation between the parts of the periphery or surface . . . ." (*Id.* at p. 2087.)

Agency's findings of urbanization and blight are predicated on an erroneous reading of the statute, those findings cannot stand.

### D. *Meaning and Application of "Inadequate Size" Requirement*

Appellants and respondents also disagree over the meaning and application of the statutory requirement that the subdivided lots be of "inadequate size" for "proper usefulness and development." (§ 33031(a)(4).)

In a response to written objections, the consultant to Redevelopment Agency addressed the inadequate size requirement as follows: "As to the inadequate size of the parcels comprising the Second Amendment Area, any parcel intended for development that is of insufficient size to extend to a right-of-way permitting access to utilities from the site and access to the site for occupants and visitors is of inadequate size."

Webster's Third New International Dictionary, *supra*, at page 1139, defines "inadequate" to mean insufficient or deficient. In the quoted statement, the consultant construed "inadequate" to mean insufficient. The basis for the consultant's determination that the subdivided lots were of "inadequate size" for "proper usefulness and development" is the same as used to conclude that the lots were of "irregular form and shape."

Respondents' interpretation of the "inadequate size" requirement so that it is satisfied by the same factor (lack of access) as that used to satisfy the "irregular form and shape" requirement further illustrates that access is not a characteristic that defines the regularity of the form and shape of a lot. In other words, if one accepts the interpretation that physical and legal access to a right-of-way determine the adequacy of a lot's size, then access is not a matter of form and shape.

Because our analysis of the "inadequate size" requirement is limited to its relationship to the "irregular form and shape" requirement, we need not address the following issues. What does the term "subdivided lots" mean for purposes of section 33031? Should the "inadequate size" requirement be construed narrowly because of the references in the legislative materials to postage-stamp lots?[13] Could a parcel that is one mile square ever be deemed

---

[13] For example, the Analysis of the Assembly Committee on Housing and Community Development issued in connection with the June 16, 1993, hearing states that Assembly Bill No. 1290 (1993–1994 Reg. Sess.) "[d]efines a blighted area to exclusively be characterized by the existence of subdivided lots of irregular form and shape, and improper size for proper usefulness ('postage stamp' lots)." (*Id.* at p. 3, original underscoring.)

of "inadequate size"? (See *Beach-Courchesne v. City of Diamond Bar, supra,* 80 Cal.App.4th at p. 405 [finding of small lot size not supported by evidence where redevelopment area contained parcels as large as 47, 41, 36, 35 and 24 acres].) Does the administrative record contain substantial evidence to support the finding that the land added to the redevelopment area was causing "a serious physical and economic burden on the community" for purposes of section 33030, subdivision (b)(1)? Does the administrative record contain substantial evidence to support the finding that the redevelopment plan is economically feasible for purposes of section 33367, subdivision (d)(3)?

## III. *Motions for Judicial Notice*

### A. *Subsequent Legislation*

Appellants' motion for judicial notice filed on August 24, 2006, concerns Assembly Bill No. 782 (2005–2006 Reg. Sess.), which deletes the reference to section 33031(a)(4) from the criteria in section 33030, subdivision (b) that establish a "blighted area." (Assem. Bill No. 782 (2005–2006 Reg. Sess.) § 1.)

Appellants' motion for judicial notice filed on September 11, 2006, concerns legislative materials related to Assembly Bill No. 782 (2005–2006 Reg. Sess.), some of which reference this lawsuit.

Appellants' motion for judicial notice filed on October 24, 2006, concerns Senate Bill No. 1206 (2005–2006 Reg. Sess.), which revised the text of section 33031(a)(4). (Sen. Bill No. 1206 (2005–2006 Reg. Sess.) § 3.)

Because we have decided this appeal based on the statutory language in effect at the time the Second and the Third Amendments were adopted, we do not address whether the subsequent legislation applies in this case. Accordingly, appellants' motions for judicial notice filed on August 24, 2006, September 11, 2006, and October 24, 2006, are denied.

### B. *Prior Annexation*

Appellants' motion for judicial notice filed on July 28, 2006, concerns the certificate of completion relating to the annexation of approximately 16,000 acres and the detachment of approximately 4,800 acres by City in 1992. The motion is denied.

## DISPOSITION

The judgments are reversed. The superior court is instructed to enter judgments in favor of appellants. Appellants shall recover their costs on appeal.

Harris, Acting P. J., and Cornell, J., concurred.

Respondents' petition for review by the Supreme Court was denied April 11, 2007, S150335. George, C. J., did not participate therein.