[No. H032945. Sixth Dist. June 15, 2010.]

COUNTY OF LOS ANGELES, Plaintiff and Respondent, v.
GLENDORA REDEVELOPMENT PROJECT et al., Defendants and
Appellants.

818

COUNSEL

Stradling Yocca Carlson & Rauth, Allison E. Burns, Jennifer Yu; Horvitz & Levy, David S. Ettinger and Jeremy B. Rosen for Defendants and Appellants.

Raymond G. Fortner, Jr., County Counsel, Robert E. Kalunian, Acting County Counsel, Elizabeth Cortez, Assistant County Counsel, Thomas M. Tyrrell, Principal Deputy County Counsel; Law Offices of Kathryn Reimann and Kathryn Reimann for Plaintiff and Respondent.

OPINION

McADAMS, J.—This appeal concerns the validity of appellants' redevelopment plan, adopted by ordinance in July 2006. The trial court invalidated the ordinance, concluding that the necessary findings of blight were not supported by substantial evidence in the administrative record. Having independently reviewed the record, we reach the same conclusion. We shall therefore affirm.

## BACKGROUND

The appellants are the City of Glendora, the City Council of the City of Glendora, and the Glendora Redevelopment Agency (collectively, Glendora). The respondent here is the County of Los Angeles (the County).

I. *Redevelopment Law*

This case involves the Community Redevelopment Law (CRL). (Health & Saf. Code, § 33000 et seq.)[1]

■ "The California Redevelopment Act was enacted in 1945 to address problems of urban blight." (*Evans v. City of San Jose* (2005) 128 Cal.App.4th 1123, 1131 [27 Cal.Rptr.3d 675] (*Evans*).) "Redevelopment agencies are authorized to combat blight using three extraordinary powers—the diversion of property taxes that otherwise would have gone to the state or other government entities; the use of public funds to subsidize private enterprise; and the power of eminent domain." (*Neilson v. City of California City* (2007) 146 Cal.App.4th 633, 642 [53 Cal.Rptr.3d 143] (*Neilson*).)

"A finding that a project area is blighted is the absolute prerequisite for redevelopment." (*Evans, supra,* 128 Cal.App.4th at p. 1146, citing *Sweetwater*

---

[1] Unspecified statutory references are to the Health and Safety Code.

*Valley Civic Assn. v. City of National City* (1976) 18 Cal.3d 270, 277 [133 Cal.Rptr. 859, 555 P.2d 1099].) "The physical and economic conditions demonstrating the existence of blight are set forth in sections 33030 and 33031." (*County of Riverside v. City of Murrieta* (1998) 65 Cal.App.4th 616, 624 [76 Cal.Rptr.2d 606] (*Riverside*).) "In summary, an area is blighted, and hence eligible for redevelopment, if it is predominantly urban and if it is adversely affected by economic and physical conditions too serious to be cured by private or governmental enterprise, thus necessitating redevelopment." (*Id.* at pp. 624–625.)

"This required finding of blight is subject to judicial review in a validation action [citation], and if there is insufficient evidence that the area is indeed blighted, the court must issue a judgment invalidating the redevelopment plan." (*Boelts v. City of Lake Forest* (2005) 127 Cal.App.4th 116, 120 [25 Cal.Rptr.3d 164] (*Boelts*).)

## II. *Glendora's Redevelopment Plan*

Over the years, Glendora has adopted redevelopment plans for five project areas; four are at issue here. "Project Area" 1 was established in 1974, followed by Project Areas 2 and 3 in 1976. Project Area 4, which was established in 1982, "is no longer operational" and is not at issue in this case. Project Area 5 was created in 2006, by adoption of the ordinance challenged here.

In July 2006, Glendora adopted ordinance No. 1845, which approved the "Redevelopment Plan for the Merged Glendora Redevelopment Project," called the "Merged Redevelopment Plan" for short. The Merged Redevelopment Plan (1) amended the redevelopment plans for existing Project Areas 1, 2, and 3; (2) created a new Project Area 5; and (3) merged Project Areas 1, 2, 3, and 5 "for financing purposes" under the CRL and "to extend the period during which the power of eminent domain is available to" Glendora's redevelopment agency.

Ordinance No. 1845 incorporates findings that blight exists in Project Area 5 and remains in Project Areas 1, 2, and 3. It also includes this finding: "The elimination of the remaining blight and the continuation of the redevelopment of the Merged Project Area would not reasonably be expected to be accomplished by private enterprise alone without the aid and assistance of the Agency."

III. *Proceedings in the Trial Court*

A. *Pleadings*

In September 2006, the County filed this reverse validation action in Los Angeles County Superior Court. (§ 33501, subd. (a); Code Civ. Proc., § 860 et seq.; see *McLeod v. Vista Unified School Dist.* (2008) 158 Cal.App.4th 1156, 1166 [71 Cal.Rptr.3d 109].) The complaint challenged "the approval and adoption of the Redevelopment Plan for the Merged Glendora Redevelopment Project adopted by Ordinance No. 1845, on July 18, 2006."

In its complaint, the County alleged violations of the CRL. The County also asserted the lack of sufficient evidence for the blight findings made by Glendora in adopting ordinance No. 1845. The County sought a declaration that the ordinance was invalid.

In October 2006, Glendora answered the complaint, denying the County's substantive allegations and interposing 20 affirmative defenses.

B. *Change of Venue*

In December 2006, venue was transferred to Monterey County.

C. *Record; Briefs; Hearing*

In June 2007, the administrative record was certified and lodged with the court. Thereafter, by stipulation, three supplemental volumes of administrative record were lodged. As supplemented, the entire administrative record was received in evidence.

Pursuant to a stipulated schedule, the County submitted an opening trial brief, Glendora filed opposition, and the County replied. In December 2007, the court conducted a hearing. At the conclusion of the hearing, the court took the matter under submission.

D. *Decision; Judgment*

In February 2008, the trial court filed a 62-page statement of decision. In its statement of decision, the court first addressed the issue of tax increment caps on the existing project areas.[2] The court considered the County's

---

[2] Tax increment caps operate as a "limitation on the number of dollars to be allocated to the redevelopment agency" from tax increment revenue sharing. (§ 33354.6; see § 33670; Cal. Const., art. XVI, § 16.) "Increment revenue, which is the primary source of funding for redevelopment projects, consists of the increased property tax revenue resulting from rises in

arguments, advanced as questions of law, that Glendora could not (1) amend the tax increment limits for its first two redevelopment projects or (2) merge and combine the separate tax increment caps of its first three projects into a single limit. The court rejected both contentions.

The court next considered the sufficiency of Glendora's blight showing. The court exhaustively discussed the evidence of blight, first in Project Area 3, then in Project Area 5, and then in the "Merged Project Area," which includes Project Areas 1 and 2. After extensive discussion, the court ultimately determined that "Glendora's findings of blight are not supported by substantial evidence" in the administrative record. Furthermore, the court concluded, given the absence of blight, "Glendora is without eminent domain authority in this instance."

Based on its determination that the administrative record contains insufficient evidence of blight, the court invalidated ordinance No. 1845.

In April 2008, judgment was entered. Consistent with the court's statement of decision, the judgment declares ordinance No. 1845 "null, void ab initio, and invalid in all respects."

IV. *Appeal*

In May 2008, Glendora brought this appeal. The County did not cross-appeal. The record consists of 29 volumes of appellants' appendix, comprising nearly 6,800 pages.

---

the assessed valuation of property in a redevelopment project area." (*County of Santa Clara v. Redevelopment Agency* (1993) 18 Cal.App.4th 1008, 1011 [22 Cal.Rptr.2d 868]; see generally 11 Miller & Starr, Cal. Real Estate (3d ed. 2001) § 30B:6, pp. 16–21; Coomes, Redevelopment in Cal. (4th ed. 2009) pp. 231–250.) When an area is redeveloped, if "the assessed valuation of taxable property in the project increases, the taxes levied on such property in the project area are divided between the taxing agency and the redevelopment agency. The taxing agency receives the same amount of money it would have realized under the assessed valuation existing at the time the project was approved, while the additional money resulting from the rise in assessed valuation is placed in a special fund for repayment of indebtedness incurred in financing the project." (*Redevelopment Agency v. County of San Bernardino* (1978) 21 Cal.3d 255, 259 [145 Cal.Rptr. 886, 578 P.2d 133], italics omitted.) That accomplishes the purpose of "tax increment financing of community redevelopment: 'to return to the taxing agencies the tax revenues they would have received had there been no redevelopment, and to permit the increase above that formerly received from the blighted area to be used to pay off the cost of redevelopment.' " (*Id.* at p. 262.) As case law recognizes, however, that purpose is not always achieved in practice. "In fact, the CRL has sometimes been misused to subsidize a city's economic development through the diversion of property tax revenues from other taxing entities, a feat made possible by section 33670." (*Lancaster Redevelopment Agency v. Dibley* (1993) 20 Cal.App.4th 1656, 1658 [25 Cal.Rptr.2d 593]; see also, e.g., *Regus v. City of Baldwin Park* (1977) 70 Cal.App.3d 968, 982 [139 Cal.Rptr. 196] (*Regus*); cf. § 33321.)

In its opening brief, Glendora defends its approval of the redevelopment plan as legal and proper. More specifically, Glendora argues, substantial evidence supports the creation of Project Area 5 and the amendments to Project Areas 1, 2, and 3, as well as the reestablishment of the power of eminent domain.

In its respondent's brief, the County disputes Glendora's arguments. Further, pressing its own claims of error, the County asserts that the trial court erred in recognizing Glendora's authority to amend and merge the tax increment caps for its earlier redevelopment projects.

In its reply brief, Glendora discusses several points. First, Glendora reasserts that its redevelopment plan is supported by substantial evidence in the administrative record. As part of that discussion, Glendora cites the postjudgment enactment of section 33333.13, which includes a legislative finding that the redevelopment plan for Project Area 3 "contains an unrealistically low dollar limit on the receipt of tax increment" that "severely restricts" Glendora's ability "to address conditions of blight which remain within its Project Area No. 3." (§ 33333.13, subd. (a).) Additionally, Glendora's reply brief addresses the County's assertions of error concerning the tax increment caps.

In addition to their appellate briefs, the parties submitted a number of other documents in this court, most of them relating to section 33333.13. The County asks this court to take judicial notice of 10 documents reflecting the legislative history of that section.[3] The County also requests permission to file supplemental briefing on the validity of section 33333.13, attaching a proposed brief. Glendora opposes that briefing on the merits, supported by its own request for judicial notice of four documents.[4]

We requested and received further briefing on questions germane to the scope of this appeal.[5]

---

[3] The documents attached to the County's request for judicial notice include gubernatorial proclamations in December 2008 declaring a fiscal emergency and convening the Legislature; the "complete bill history" of Senate Bill No. 3X 8 (2009–2010 3d Ex. Sess.); the text of the bill, as introduced, as amended, and as chaptered in February 2009; and Senate and Assembly floor analyses of the bill.

[4] The documents attached to Glendora's request for judicial notice are a legislative summary from 1997–1998 on the subject of redevelopment; a letter dated March 16, 2009, from the County's auditor to Glendora's city manager concerning one of the redevelopment projects at issue in this litigation; a copy of Senate Bill No. 3X 8 (2009–2010 3d Ex. Sess.); and a copy of Senate Bill No. 1165 (2003–2004 Reg. Sess.), chaptered July 7, 2004, called the Local Government Omnibus Act of 2004.

[5] We requested briefing on these questions: (A) Given the absence of any cross-appeal, are respondents' claims of trial court error cognizable? (B) Given the presumption that new

## THRESHOLD ISSUES

At the threshold, we discuss the scope of our review. As we explain, (I) the County's claims of error are not cognizable, and (II) section 33333.13 has no application here.

### I. *The County's Claims*

■ "As a general matter, 'a respondent who has not appealed from the judgment may not urge error on appeal.'" (*Estate of Powell* (2000) 83 Cal.App.4th 1434, 1439 [100 Cal.Rptr.2d 501]; accord, *Townsend v. Townsend* (2009) 171 Cal.App.4th 389, 398 [89 Cal.Rptr.3d 760].)

"A limited exception to this rule is provided by Code of Civil Procedure section 906, which provides in pertinent part: 'The respondent . . . may, without appealing from the judgment, request the reviewing court to and it may review any of the foregoing [described orders or rulings] *for the purpose of determining whether or not the appellant was prejudiced by the error or errors upon which he relies for reversal or modification of the judgment from which the appeal is taken.*' (Italics added.)" (*California State Employees' Assn. v. State Personnel Bd.* (1986) 178 Cal.App.3d 372, 382, fn. 7 [223 Cal.Rptr. 826]; see *Shapiro v. Clark* (2008) 164 Cal.App.4th 1128, 1138 [80 Cal.Rptr.3d 398].) But the statute does "not authorize the reviewing court to review any decision or order from which an appeal might have been taken." (Code Civ. Proc., § 906.)

"The purpose of the statutory exception is to allow a respondent to assert a legal theory which may result in affirmance of the judgment." (*California State Employees' Assn. v. State Personnel Bd., supra,* 178 Cal.App.3d at p. 382, fn. 7; see *Mayer v. C.W. Driver* (2002) 98 Cal.App.4th 48, 57 [120 Cal.Rptr.2d 535]; *Central Manufacturing District, Inc. v. Board of Supervisors* (1960) 176 Cal.App.2d 850, 857 [1 Cal.Rptr. 733].) The County casts its challenges to the trial court's tax increment rulings in this mold, arguing that they are additional theories supporting affirmance of the judgment. As the County acknowledges, however, when the reviewing court "would affirm independent of the additional legal theories" offered by a respondent, the respondent's claims are "generally not reviewable." That is the situation here.

---

statutes operate only prospectively, does section 33333.13 apply to this appeal? (C) If the statute applies to this appeal, should this court reach the parties' arguments concerning its constitutionality? (D) If the statute applies to this appeal, what effect does it have on the issues before this court? Does it moot the appeal in whole or in part? Does the statute address or resolve any disputed questions of law? What weight should be given to the legislative finding of blight?

In this case, we can and do decide the appeal based solely on the issues raised by Glendora. For that reason, we need not and do not consider the County's additional theories for invalidating ordinance No. 1845.

## II. *Subsequent Legislation*

Section 33333.13 became law in February 2009.[6] That legislation thus postdates Glendora's 2006 actions, challenged by the County in the trial court, and the trial court's 2008 decision, challenged by Glendora in this appeal.

The parties disagree about whether section 33333.13 applies in this proceeding. Glendora urges its consideration here, asserting that "the Legislature has now determined that Project Area No. 3 is blighted and entitled to an increased tax increment." The County disputes the provision's applicability.

---

[6] Section 33333.13 was part of Senate Bill No. 3X 8 (2009–2010 3d Ex. Sess.), which was passed as urgency legislation and chaptered on February 20, 2009. (Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 4.) That legislation affected more than two dozen statutory provisions in seven different codes. (*Ibid.*) Section 33333.13 was among its provisions. (Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 4, § 13.) Summarizing this provision, the Legislative Counsel's Digest explains: "Existing law authorizes redevelopment agencies to collect a property tax increment in a redevelopment project area for redevelopment purposes. [¶] This bill would revise the allocation of property tax increment revenues in the City of Glendora." (Legis. Counsel's Dig., Sen. Bill No. 3X 8 (2009–2010 3d Ex. Sess.), No. 1 West's Cal. Legis. Service, p. 811.)

Section 33333.13 reads in full as follows:

"(a) The Legislature hereby finds and declares that the Glendora Community Redevelopment Agency's Redevelopment Plan for Glendora Project Area No. 3, as adopted on November 23, 1976, contains an unrealistically low dollar limit on the receipt of tax increment. The Legislature further finds and declares that this limit severely restricts the ability of the Glendora Community Redevelopment Agency to address conditions of blight which remain within its Project Area No. 3.

"(b) Notwithstanding any other law to the contrary or any redevelopment plan previously adopted by the City of Glendora, commencing in the 2008–09 fiscal year and in each fiscal year thereafter until the expiration of the time limit on the receipt of taxes and repayment of indebtedness set forth in a redevelopment plan adopted by the City of Glendora for its Project Area No. 3 pursuant to subdivision (b) of Section 33333.6 and other applicable statutes, the Glendora Community Redevelopment Agency may receive tax increment revenue from Project Area No. 3, as a separate project area or as that area may be included in a merged or amended area, in an amount of up to the greater of either of the following fiscal year:

"(1) The sum of two million six hundred dollars ($2,600,000) in each fiscal year.

"(2) In each fiscal year, an amount equal to that amount received by the agency as gross tax increment for the 2007–08 fiscal year.

"(c) The limit on the amount of tax increment that may be received by the Glendora Community Redevelopment Agency from Project Area No. 3 pursuant to subdivision (b) shall be increased each fiscal year by the greater of either (1) 2 percent per year, or (2) the average percentage increase, if any, in the number of dollars of tax increment received by the Glendora Community Redevelopment Agency in the fiscal year preceding the fiscal year for which the calculation is made from each of its other redevelopment project areas with respect to which tax increment revenues were received."

## A. *Applicability to Legal Issues*

To the extent that the legislative amendment concerns the County's tax increment arguments, there is no reason for us to consider it in this appeal. As just explained, those arguments are not before us. (*Estate of Powell, supra,* 83 Cal.App.4th at p. 1439; *Townsend v. Townsend, supra,* 171 Cal.App.4th at p. 398.)

■ To the extent that the legislative amendment is offered to support the legal issues raised by Glendora that are properly before us, its applicability turns on the question of retroactivity. There is a presumption that new substantive statutes operate only prospectively and thus do not apply to pending litigation. (*City of San Jose v. International Assn. of Firefighters, Local 230* (2009) 178 Cal.App.4th 408, 419 [100 Cal.Rptr.3d 396].) "Departure from the presumption of prospectivity is warranted only by clear legislative intent." (*Id.* at p. 420.) The presumption does not preclude application of procedural statutes, however. (*Ibid.*) Nor does the presumption apply to actions based on statutes repealed without a savings clause, where no rights have vested. (*Id.* at pp. 420–421.)

Glendora acknowledges that section 33333.13 has "a prospective effect" because it "applies from the time of its enactment forward." (Cf. *Neilson, supra,* 146 Cal.App.4th at p. 646 [court "decided this appeal based on the statutory language in effect at the time" of the redevelopment plan amendments and would "not address whether the subsequent legislation applies in this case"].) Glendora's argument for applying the new provision here is that "the Legislature has now determined that Project Area No. 3 is blighted and entitled to an increased tax increment."

In essence, Glendora relies on the Legislature's factual determination regarding blight. As we now explain, that reliance is misplaced.

## B. *Applicability to Factual Issues*

■ "It is an elementary rule of appellate procedure that, when reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered." (*Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 813 [180 Cal.Rptr. 628, 640 P.2d 764].) "This rule preserves an orderly system of appellate procedure by preventing litigants from circumventing the normal sequence of litigation." (*Ibid.*) "However, the rule is somewhat flexible; courts have not hesitated to consider postjudgment events when legislative changes have occurred subsequent to a judgment [citations] or when subsequent events have caused issues to become moot [citation]." (*Ibid.*)

In *Reserve Insurance*, the California Supreme Court found it "appropriate to consider Reserve's insolvency" on the disputed issue of coverage under an excess insurance policy. (*Reserve Insurance Co. v. Pisciotta, supra*, 30 Cal.3d at p. 813.) In the high court's words, "because the fact is not in dispute, we do not usurp the fact-finding function of the trial court. A prompt determination by us avoids the necessity for repetitive litigation of issues that have been fully briefed. Furthermore, the court records regarding Reserve's insolvency would properly be the subject of judicial notice. (Evid. Code, § 452, subd. (d)(1).)" (*Ibid.*)

Our case is different. Here, the critical postjudgment fact is the legislative finding of blight. Blight was the central disputed factual issue in the trial court. Accepting the later-enacted section 33333.13 as a binding factual determination improperly circumvents "the normal sequence of litigation." (*Reserve Insurance Co. v. Pisciotta, supra*, 30 Cal.3d at p. 813.)

■ Moreover, the particular legislative finding proffered here is not one that compels judicial deference. "The legislative role necessitates that policy decisions be made." (*Schabarum v. California Legislature* (1998) 60 Cal.App.4th 1205, 1219 [70 Cal.Rptr.2d 745].) "The performance of the policymaking role of the Legislature necessitates that the Legislature engage in certain factfinding processes. These are not the type of case-specific factual determinations that are intrinsic to the judicial function, but are instead 'an indispensable incident and auxiliary to the proper exercise of legislative power.' " (*Ibid.*) "Although courts must give legislative findings great weight and should uphold them unless unreasonable or arbitrary," courts also have an obligation to ensure that the legislative body " 'has drawn reasonable inferences based on substantial evidence.' " (*Professional Engineers v. Department of Transportation* (1997) 15 Cal.4th 543, 569 [63 Cal.Rptr.2d 467, 936 P.2d 473]; accord, *People v. McKee* (2010) 47 Cal.4th 1172, 1206–1207 [104 Cal.Rptr.3d 427, 223 P.3d 566].)

As California Supreme Court authority recognizes, legislative "findings, standing alone and without any apparent evidentiary or empirical support, would be insufficient to supplant the trial court's express findings to the contrary." (*Professional Engineers v. Department of Transportation, supra*, 15 Cal.4th at p. 572.) So far as we can determine from the parties' submissions, that is the situation here. Neither party has submitted any document indicating that the Legislature considered any empirical data concerning blight in Glendora.

For these reasons, we decline to treat section 33333.13 as a binding determination on the disputed factual question of remaining blight in Project Area 3.

With the scope of appellate review thus limited, we turn to the parties' contentions concerning the sufficiency of the evidence of blight.

## SUBSTANTIVE ISSUES

We begin with an overview of the governing legal principles. We then apply those principles to the evidence in the administrative record.

### I. *Legal Principles*

■ "To allow redevelopment under CRL, the proposed area must be blighted." (*Sweetwater Valley Civic Assn. v. City of National City, supra*, 18 Cal.3d at p. 277.) The statutory provisions defining blight have "evolved" over time. (*Blue v. City of Los Angeles* (2006) 137 Cal.App.4th 1131, 1151–1152, fn. 16 [41 Cal.Rptr.3d 10] (*Blue*); *Beach-Courchesne v. City of Diamond Bar* (2000) 80 Cal.App.4th 388, 407, fn. 11 [95 Cal.Rptr.2d 265] (*Diamond Bar*).) Generally speaking, the statutory definitions have become "more restrictive with the passage of time." (Coomes, Redevelopment in Cal., *supra*, at p. 39.) "Major redevelopment reform legislation in 1993 (AB 1290) and 2006 (SB 1206) has progressively narrowed and tightened the statutory definition of blight." (*Ibid.*) The provisions that govern this case are contained in sections 33030 and 33031, as they read in 2006.[7]

### A. *Statutory Criteria*

■ "To be found blighted, an area must satisfy four criteria." (*San Franciscans Upholding the Downtown Plan v. City & County of San Francisco* (2002) 102 Cal.App.4th 656, 698 [125 Cal.Rptr.2d 745] (*San Franciscans*); see *Friends of Mammoth v. Town of Mammoth Lakes Redevelopment Agency* (2000) 82 Cal.App.4th 511, 538–539 [98 Cal.Rptr.2d 334] (*Mammoth*).)

First, the area must be "predominantly urbanized," as statutorily defined. (§§ 33030, subd. (b)(1), 33320.1.)

Second, the area must be "characterized by" one or more conditions of *physical* blight, as statutorily defined. (§ 33030, subd. (b)(1), (2)(A); see § 33031, subd. (a).) As stated in the 2006 iteration of the statute, section 33031, subdivision (a), "describes [four] physical conditions that cause blight:

---

[7] Those provisions have since been amended, effective January 1, 2007. (Stats. 2006, ch. 113, § 1; Stats. 2006, ch. 595, § 2.) For ease of discussion, and to avoid confusion, we will cite the applicable 2006 provisions as if they were current law, without using the word "former." We will use the word "former" to describe the 1993 version of the statute that was in effect prior to 2006. (Stats. 1993, ch. 942.)

[¶] (1) Buildings in which it is unsafe or unhealthy for persons to live or work. These conditions may be caused by serious building code violations, dilapidation and deterioration, defective design or physical construction, faulty or inadequate utilities, or other similar factors. [¶] (2) Factors that prevent or substantially hinder the viable use or capacity of buildings or lots. This condition can be caused by a substandard design, inadequate size given present standards and market conditions, lack of parking, or similar factors. [¶] (3) Adjacent or nearby uses that are incompatible with each other and which prevent the economic development of those parcels or other portions of the project area. [¶] (4) The existence of subdivided lots of irregular form and shape and inadequate size for proper usefulness and development that are in multiple ownership."

Third, the area must be "characterized by" one or more conditions of *economic* blight, as statutorily defined. (§ 33030, subd. (b)(1), (2)(B); see § 33031, subd, (b).) As it read in 2006, section 33031, subdivision (b), described five "economic conditions that cause blight: [¶] (1) Depreciated or stagnant property values or impaired investments, including . . . those properties containing hazardous wastes . . . . [¶] (2) Abnormally high business vacancies, abnormally low lease rates, high turnover rates, abandoned buildings, or excessive vacant lots within an area developed for urban use and served by utilities. [¶] (3) A lack of necessary commercial facilities that are normally found in neighborhoods, including grocery stores, drug stores, and banks and other lending institutions. [¶] (4) Residential overcrowding or an excess of bars, liquor stores, or other businesses that cater exclusively to adults, that has led to problems of public safety and welfare. [¶] (5) A high crime rate that constitutes a serious threat to the public safety and welfare."

Fourth, these "blighting conditions must predominate in such a way as to affect the utilization of the area, causing a physical and economic burden on the community." (*Evans, supra*, 128 Cal.App.4th at p. 1131.) In the words of the applicable statutory provision, the blight must be "so prevalent and so substantial that it causes a reduction of, or lack of, proper utilization of the area to such an extent that it constitutes a serious physical and economic burden on the community which cannot reasonably be expected to be reversed or alleviated by private enterprise or governmental action, or both, without redevelopment." (§ 33030, subd. (b)(1).)

With respect to the second and third requirements, "at least one type of physical blight and one type of economic blight" in combination must be shown. (*Evans, supra*, 128 Cal.App.4th at p. 1147; see *San Franciscans, supra*, 102 Cal.App.4th at p. 700; § 33030, subd. (b)(2)(A).) Alternatively, "in lieu of the second and third requirements (being characterized by economic and physical conditions causing blight), the area may instead be characterized

by the existence of subdivided lots of irregular form and shape and inadequate size for proper usefulness and development that are in multiple ownership." (*Mammoth, supra,* 82 Cal.App.4th at p. 539, fn. 7; see *Diamond Bar, supra,* 80 Cal.App.4th at pp. 405–406; § 33030, subd. (b)(2)(B).) "An area that meets all of the conditions above may, in addition, be characterized by inadequate public improvements, parking facilities, or utilities." (*Mammoth,* at p. 539; see *Diamond Bar,* at p. 406; § 33030, subd. (c).)

### B. *Nexus Requirements*

■ "In some instances, the statute requires a finding of a nexus . . . between a particular characteristic being reviewed and the actual condition being caused." (*Mammoth, supra,* 82 Cal.App.4th at p. 538; accord, *Graber v. City of Upland* (2002) 99 Cal.App.4th 424, 430–431 [121 Cal.Rptr.2d 649].) Where statutorily required, there must be "substantial evidence quantifying the effect the physical condition has on the economic viability of the existing use or capacity of the building or lot." (*Mammoth,* at p. 555; see *Diamond Bar, supra,* 80 Cal.App.4th at p. 403.) Specific nexus requirements are found in section 33031, subdivision (a)(2), (3), and (4). Thus, for example, a nexus is required where blight results from inadequate parking. (*Mammoth,* at p. 555; *Diamond Bar,* at p. 403; § 33031, subd. (a)(2).) Likewise, when incompatible uses are cited as the blighting conditions, the redevelopment proponent must "show how these uses are preventing economic development." (*Mammoth,* at p. 559; see *Diamond Bar,* at pp. 403–404; § 33031, subd. (a)(3).) That same nexus requirement also comes into play where blight is based on irregular parcel shape or inadequate parcel size. (*Diamond Bar,* at p. 405; § 33031, subd. (a)(4).)

Moreover, beyond the specific statutory requirements for particular blighting conditions, a connection must exist "between the cause of the alleged blight and the proposed remediation." (*Diamond Bar, supra,* 80 Cal.App.4th at p. 402.)

Finally, in all cases, there must be a causal connection between the conditions of blight and "a reduction of, or lack of, proper utilization of the area to such an extent that it constitutes a serious physical and economic burden on the community which cannot reasonably be expected to be reversed or alleviated by private enterprise or governmental action, or both, without redevelopment." (§ 33030, subd. (b)(1).)

### C. *Findings Requirements*

■ Blight findings are required when a new redevelopment project area is created. (§ 33367, subd. (d)(1); *Boelts, supra,* 127 Cal.App.4th at p. 120.)

■ Blight findings also are required upon amendment of existing redevelopment project areas that utilize tax increment revenue. (§ 33354.6; *Boelts, supra*, 127 Cal.App.4th at p. 121.) "When an agency proposes to amend a redevelopment plan which utilizes tax increment financing to add new territory to the project area, to increase either the limitation on the number of dollars to be allocated to the redevelopment agency or the time limit on the establishing of loans, advances, and indebtedness . . . , to lengthen the period during which the redevelopment plan is effective, to merge project areas, or to add significant additional capital improvement projects, as determined by the agency, the agency shall follow the same procedure, and the legislative body is subject to the same restrictions as provided for in this article for the adoption of a plan." (§ 33354.6, subd. (a); see generally 11 Miller & Starr, Cal. Real Estate, *supra*, § 30B:14, pp. 47–48.) Thus, the "local legislative body adopting the amendment must make the findings required to support an initial redevelopment plan, one of which is a finding of blight." (*Boelts*, at p. 121, italics omitted.)

"The ordinance adopting the amendment shall contain findings that both (1) significant blight remains with the project area and (2) the blight cannot be eliminated without the establishment of additional debt and the increase in the limitation on the number of dollars to be allocated to the redevelopment agency." (§ 33354.6, subd. (b).) The statute does not specify what constitutes "significant" blight. (Cf. § 33333.10, subd. (c) [defining "significant" and "blight" for purposes of that section].) But at least one court has assessed blight in an amended project area using the definitions of blight contained in sections 33030 and 33031. (*Blue, supra*, 137 Cal.App.4th at pp. 1147, 1149–1150.)

D. *Judicial Review*

"The scope of judicial review of an agency's decision to adopt a redevelopment plan is quite limited. Both the trial court and this court review the administrative record to determine whether the findings and decision of the legislative body are supported by substantial evidence." (*Evans, supra*, 128 Cal.App.4th at p. 1145; see *Blue, supra*, 137 Cal.App.4th at p. 1140.) Appellate "review is done independent of any determinations made by the superior court." (*Neilson, supra*, 146 Cal.App.4th at p. 641; cf. *Diamond Bar, supra*, 80 Cal.App.4th at p. 394 [examining "whether substantial evidence supports the trial court's determinations"].)

In examining the administrative record, we resolve all " 'reasonable doubts' " and "accept all reasonable inferences supporting the administrative findings." (*Evans, supra*, 128 Cal.App.4th at p. 1146.) "The fact that different inferences or conclusions could be drawn, or that different methods of

gathering and compiling statistics could have been employed, is not determinative in a substantial evidence review." (*Id.* at p. 1148.)

On the other hand, however, "a local agency's findings in support of its adopting a redevelopment plan are not conclusive." (*Mammoth, supra,* 82 Cal.App.4th at p. 538.) "The Community Redevelopment Law has established factors to be considered in determining whether an area is blighted, and it is the court's role to ensure those factors are taken into account." (*Emmington v. Solano County Redevelopment Agency* (1987) 195 Cal.App.3d 491, 498 [237 Cal.Rptr. 636] (*Emmington*); accord, *Mammoth,* at p. 538.) Those factors include nexus requirements. (*Mammoth,* at p. 538.) "The statute clearly intends for evidence of the physical condition's impact on economic viability to be in the record to support the finding." (*Id.* at p. 555.) "If the specific finding required by the Community Redevelopment Law cannot be made from the evidence in the administrative record, the evidence is not ' "substantial proof" of the essentials which the law requires' and the finding is not supported by substantial evidence." (*Id.* at p. 538; accord, *Graber v. City of Upland, supra,* 99 Cal.App.4th at pp. 430–431.)

Furthermore, blight findings must be supported by "tangible proof which can be scrutinized in a meaningful way." (*Diamond Bar, supra,* 80 Cal.App.4th at p. 402; see *Riverside, supra,* 65 Cal.App.4th at p. 627; Coomes, Redevelopment in California, *supra,* p. 42.) It is not enough "to issue a report and to adopt an ordinance speaking in the statutory language." (*Diamond Bar,* at p. 407.) Courts properly reject blight findings that are "set forth in conclusionary and summary terms." (*Id.* at p. 403; see *Mammoth, supra,* 82 Cal.App.4th at pp. 557–558; *Boelts, supra,* 127 Cal.App.4th at p. 135.)

"In short, the courts are required to be more than rubber stamps for local governments." (*Emmington, supra,* 195 Cal.App.3d at p. 498; see *Mammoth, supra,* 82 Cal.App.4th at p. 538.) To that end, "we independently determine the law applicable to the facts in the administrative record" in assessing whether the statutory requirements have been met. (*Graber v. City of Upland, supra,* 99 Cal.App.4th at p. 430; see *Blue, supra,* 137 Cal.App.4th at p. 1140 ["court reviews de novo issues involving the interpretation and application of statutes . . ."].)

II. *Analysis*

With those principles in mind, we now examine the administrative record de novo to determine whether it contains substantial evidence of blight to satisfy each of the requisite statutory criteria. Absent such evidence, there is no predicate for Glendora's use of the extraordinary powers of redevelopment.

## A. *The Record*

Based on the parties' citations, the pertinent part of the administrative record includes these items: the June 2004 report by GRC Redevelopment Consultants to the Glendora City Council concerning Project Area 5 (the 2004 GRC Report); the June 2005 blight data report by Robert Miars concerning Project Area 3 (the Miars Report); the May 2006 report by GRC Redevelopment Consultants to the Glendora City Council concerning the Merged Project Area (the 2006 GRC Report); the June 2006 city council agenda item concerning the Merged Redevelopment Plan (Agenda Item); the June 2006 objections by the County to the Merged Redevelopment Plan (County Objections); and the July 2006 response by Glendora to the County's objections (Response to Objections).

## B. *The Statutory Requirements*

### 1. *Urbanization; Section 33030, Subdivision (b)(1)*

In this case, there is no dispute that the merged project area "is 'predominantly urbanized,' and thus fulfills the first essential requirement for inclusion in a redevelopment area." (*San Franciscans, supra*, 102 Cal.App.4th at p. 700, fn. 25, quoting § 33030, subd. (b)(1).)

### 2. *Physical Blight Conditions; Section 33031, Subdivision (a)*

The next requirement is at least one condition of physical blight. Section 33031, subdivision (a), describes four possible conditions of physical blight. We consider Glendora's physical blight claims under each separate provision in turn.[8] As explained in detail below, after considering the evidence offered for each claim in the context of the applicable legal requirements, we find no substantial evidence of physical blight under any of the statutory categories.

### a. *Unsafe or unhealthy buildings; section 33031, subdivision (a)(1)*

In the applicable version of the statute, the first enumerated physical blight condition is: "Buildings in which it is unsafe or unhealthy for persons to live or work. These conditions can be caused by serious building code

---

[8] We note that Glendora asserts a variety of blighting conditions without ascribing them to a particular statutory provision. For example, in the portion of its opening brief devoted to section 33031, subdivision (a)(1), Glendora lists such items as inadequate infrastructure and hazardous materials, without explaining how they fall within any of the particular indicia described in that subdivision. Later, in the portion of its brief devoted to section 33031, subdivision (a)(2), Glendora repeats the pattern, duplicating many of the listed items.

violations, dilapidation and deterioration, defective design or physical construction, faulty or inadequate utilities, or other similar factors." (§ 33031, subd. (a)(1).)

"Simply because building code violations exist, or buildings are deteriorated or dilapidated, or suffer from defects in design or construction, or fail to comply with seismic safety codes does not constitute substantial evidence to support the conclusion that those buildings are unsafe or unhealthy for human occupancy. Accordingly, a report that identifies such violations without going the further step of discussing how those violations result in unsafe or unhealthy buildings does not constitute substantial evidence to support a finding of physical blight." (11 Miller & Starr, Cal. Real Estate, *supra*, § 30B:8, p. 30, citing *Mammoth, supra*, 82 Cal.App.4th at pp. 550–554; cf. *Blue, supra*, 137 Cal.App.4th at p. 1151.)

(i) *Code violations*

"Theoretically, all building codes are designed for the health and safety of a structure's occupants." (*Mammoth, supra*, 82 Cal.App.4th at p. 550.) Nevertheless, under this criterion, the relevant inquiry focuses on "serious building code violations which created an unsafe building, as opposed to any code violation which may or may not result in an unsafe building." (*Ibid.*; see *Evans, supra*, 128 Cal.App.4th at p. 1148 [more than one-third of the "neighborhoods exhibited a prevalence of significantly and substantially blighted areas as related to health and safety building code violations"].)

As we now explain, Glendora fails to distinguish between serious and minor code violations, and it fails to demonstrate the requisite connection between code violations and unsafe buildings.

Concerning code violations in Project Area 3, Glendora asserts that at least 80 properties lack city permits, "are structurally unsound," and "pose a serious concern regarding the quality of construction as well as equipment location and appropriate use." Glendora cites (1) the Miars Report and (2) the Agenda Item, which summarizes that report. The Miars Report states: "Eighty (80) properties have items without city approved permits: (dish antenna, back porch, carport, metal building, patio roof, patio structure, roof structure, storage building, pole sign, addition to building, roof mounted HVAC, converted garage)." According to the Miars Report, "each of these items can pose a serious health and safety risk to occupants." The Miars Report also cites a single property with "a water heater with no approved vent or enclosure" that "exposes the occupants of the property to serious bodily injury and renders the property unsafe for persons to occupy" and a single property with "no

sanitary facilities for workers" that is "conducive to ill health and transmission of disease which renders the property unsafe or unhealthy for persons to occupy."[9]

Concerning code violations in Project Area 5, Glendora asserts a "31% increase in code violations since 2000; further, although it comprises only 1% of the City's area, Project Area 5 accounts for an estimated 11% of all code violations . . . ." Glendora cites (1) the 2006 GRC Report and (2) its Response to Objections. In addition to providing the cited statistics, the 2006 GRC Report lists the "most common code violations" as "Signage [¶] Damaged sidewalks [¶] Illegally parked vehicles [¶] Weeds and trash [¶] Building violations." The cited portion of Glendora's Response to Objections comprises photographs depicting a number of properties with various cited defects, including "[i]nsufficient landscaping in violation of City standards."

■ The evidence in the cited reports does not demonstrate the existence of unsafe or unhealthy buildings. Neither of the reports distinguishes between serious code violations and minor ones. There is no showing how violations involving antenna, signs, or landscaping impact safety or health. The observation in the Miars Report that code violations "can pose a serious health and safety risk" does not demonstrate that any particular violation does so. Evidence "of a factor that can *cause* blight can hardly *by itself* justify a blight finding." (*Boelts, supra,* 127 Cal.App.4th at p. 136, fn. 21.) On the administrative record before us, Glendora "could not know whether the evidence of building code violations demonstrated the existence of buildings that were unsafe or unhealthy for human occupation, nor can we." (*Mammoth, supra,* 82 Cal.App.4th at pp. 550–551.) Without that critical link, the presence of code violations alone does not support a finding of physical blight under this provision.

(ii) *Dilapidation and deterioration*

■ To qualify as blight under this provision, "the characteristic of deterioration and dilapidation" must "demonstrate the existence of buildings unsafe for human occupancy." (*Mammoth, supra,* 82 Cal.App.4th at p. 551.) Glendora fails to demonstrate the critical link between the two.

Glendora asserts that "a majority of the buildings in Project Area 3 face multiple and serious conditions of dilapidation and/or deterioration" such as "roof damage, cracked stucco/plaster and other exterior wall damage, wood

---

[9] The phrase "conducive to ill health and transmission of disease" comes from the prior version of section 33031. (See former § 33031, describing "buildings . . . which are unfit or unsafe to occupy . . . and are conducive to ill health, transmission of disease, infant mortality, juvenile delinquency, and crime because of" enumerated factors.)

rot, and chipped or peeling paint." According to Glendora: "Nearly 240 buildings need some level of substantial reinvestment." Glendora cites (1) the Miars Report, (2) the Agenda Item, which summarizes it, and (3) the 2006 GRC Report. The Miars Report catalogs such problems as broken driveways or parking lots; broken or missing driveway approaches; broken, missing, or uplifted sidewalks; broken or missing curbs or gutters; a single property with a broken block wall; two properties "that are the subject of vandals or homeless" persons; two properties with missing signs; and two properties that have deteriorated oak trees. According to the Miars Report: "Deterioration can pose a health and safety risk for occupants of the properties." The 2006 GRC Report states: "Deterioration is another form of blight that dominates Project Area No. 3. To research and document structural and aesthetic conditions in the Project Area, field surveys were conducted and each property was evaluated. . . . The results of the filed survey revealed that 37% of the buildings in Project Area No. 3 are in some degree of disrepair.[10] The types of deterioration observed on those structures in need of repairs in the Project Area include: [¶] Roof damage [¶] Cracked stucco/plaster and other exterior wall damage [¶] Wood rot [¶] Chipped and/or peeling paint." The 2006 GRC Report also notes that "the average age of buildings in the Project Area is 39 years." That same report discusses commercial rehabilitation needs, stating that "a significant number" of the 400 older commercial buildings (those built there more than 30 years ago) "are likely to be in need of rehabilitation." The report does not indicate how the physical condition of the residential or commercial buildings makes them unsafe or unhealthy.

In this case, as in *Mammoth*, the definition of deterioration used in the reports "is overbroad. Peeling paint, dry rot, and lack of maintenance need not by themselves result in an unsafe or unhealthy building." (*Mammoth, supra*, 82 Cal.App.4th at p. 551.) "The breadth of the definition used in the building survey prevented [Glendora] from determining whether the Project Area could truly be characterized as containing buildings unsafe for human occupancy due to their deteriorated or dilapidated condition." (*Ibid.*; see also, e.g., *Boelts, supra*, 127 Cal.App.4th at p. 137 [the city's "assertions of dilapidation or deterioration" were lacking in "substantive content" and the city made "no attempt to show any safety or health problems for those buildings"]; *Diamond Bar, supra*, 80 Cal.App.4th at p. 398 [there was "no indication that any of the affected parcels contains a building in which it is unsafe or unhealthy for persons to live or work"]; *Regus, supra*, 70

---

[10] After stating that 37 percent of the buildings in Project Area 3 are in disrepair, the 2006 GRC Report continues: "With well over half of all buildings in disrepair, this means that nearly 240 buildings in the Project Area need some level of substantial reinvestment— everything from a complete repainting to major rehabilitation." The report does not explain the apparent discrepancy between "well over half" and 37 percent.

Cal.App.3d at p. 976 [there was "little evidence of deteriorating structures . . . and no evidence of physical dangers or health hazards to the inhabitants"].)

In the absence of data showing how deterioration results in unsafe or unhealthy buildings, the reports do not support a finding of physical blight under this provision.

### (iii) *Defective design or construction*

 To qualify as blight under this provision, "defective design or physical construction" must result in "unsafe or unhealthy" buildings. (§ 33031, subd. (a)(1); see *Mammoth, supra,* 82 Cal.App.4th at pp. 553–554.) Glendora fails to satisfy this statutory requirement. First, and generally, Glendora's showing relies largely on assumptions and conclusory findings. Second, and more specifically concerning seismic issues, there is no showing here that lack of compliance with current building standards renders any affected structures unsafe. Third, and more specifically concerning the presumed presence of hazardous materials such as lead-based paint and asbestos, there is no link between the cited problems and any proposed remediation.

With respect to Project Area 3, Glendora maintains: "Properties are unsafe and unhealthy due to the failure to comply with the Americans with Disabilities Act ('ADA')" in various enumerated respects. Glendora cites data on this point from the Miars Report. The Miars Report states: "The ADA provides that when a property owner renovates property, the property must be brought into compliance with then existing ADA standards. A common result of this mandate is a delay or absence of improvements to property in order to avoid the costs in time, money and usable space resulting from compliance with ADA requirements." The report catalogs a variety of violations of the ADA (Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 et seq.)), including noncompliant parking, paths, ramps, curbs, and restrooms. The Miars Report concludes that these ADA violations render "the property unsafe to occupy by disabled individuals" or "unsafe to access" by such persons.

Glendora also asserts: "Hazardous construction of properties in Project Area 3 endangers the lives of those who live, work and enter onto the properties" in addition to "reducing the incentive to reinvest in properties." Glendora again cites data from the Miars Report. As pertinent to the specific conditions of blight pressed by Glendora on appeal, that report discusses the absence of antisyphon valves (affecting 99 properties), and the presence of asbestos and lead-based paint (affecting 97 properties). The report states: "Antisyphon valves prevent irrigation and/or waste water from mixing with potable water. The absence of antisyphon valves is conducive to ill health and transmission of disease and renders the property unsafe or unhealthy for

persons to occupy." The report also states: "Buildings with asbestos-containing materials and/or lead based paint are conducive to ill health. Asbestos is a significant health concern when individual fibers are released into the air through damage to building materials or through routine maintenance such as sanding, drilling, or similar activities. If these fibers are inhaled, they can lead to several varieties of cancer. Lead-based paint is equally harmful and exposure to lead can result in lead poisoning. The existence of these materials onsite renders property unsafe to occupy."

Concerning Project Area 5, Glendora lists a number of design or construction problems, including (1) seismic safety issues, (2) the likely presence of asbestos or lead-based paint, (3) "inadequate electrical wiring," and (4) "faulty decks in danger of collapse." Those problems are detailed in the 2006 GRC Report. With respect to the first three of those four areas of concern, the report makes assumptions largely based on building age. As the report first explains, "the most dangerous situation in Project Area No. 5 is the lack of seismic safety. About 90% of the structures" in one specific portion of the project area "do not meet current Uniform Building Code seismic standards." Citing the average age of the homes in that locale, the report concludes that "nearly 350 dwelling units in just this portion of Project Area No. 5 were constructed prior to modern earthquake standards." As to the second area of concern, the report continues: "Due to the age of structures and the building types, the likelihood of hazardous material contamination in excess of State and Federal standards in Project Area No. 5 is high" since "approximately 80% of homes in the U.S. built prior to 1978 contain lead-based paint" and "83% of structures built before 1976 contain bulk-material asbestos." Addressing the third area of concern, the report says that "the older construction date of most of the buildings in Project Area No. 5 has also created problems related to substandard wiring." As to the fourth and final point, the report states: "Several multi-family units . . . have significant safety issues related to decks that may collapse."

In Project Area 2, Glendora asserts seismic safety issues and the presence of asbestos or lead-based paint, based on data in the 2006 GRC Report.

Most of these blight claims do not rest on evidence; instead, they rely on assumptions based on building age. That category includes (1) seismic safety concerns, (2) the presumed presence of asbestos and lead-based paint, and (3) the presumed substandard wiring in Project Area 5. (Cf. *Evans, supra*, 128 Cal.App.4th at p. 1149 ["age itself does not equate to blight" but "a prevalence of older buildings" may be "consistent with findings of deterioration, and also inadequate size"].)

Proffered as proof of blight, two of these claims also suffer from other deficiencies. For one thing, concerning seismic safety, at least one court has

rejected the notion that "failure to meet current seismic safety building codes 'is implicitly serious and unsafe.' " (*Mammoth, supra*, 82 Cal.App.4th at p. 553.) Even assuming that a structure is in violation of existing seismic safety codes, there must also be a showing that it is " 'hazardous to life in the event of an earthquake . . . .' " (*Ibid.*, quoting § 19161.) For another thing, concerning the presumed existence of hazardous materials, the 2006 GRC Report notes that Glendora "will not require removal of lead based paint, nor asbestos from any privately owned structure" absent financial assistance or issuance of a construction permit. That being so, "there is a total 'disconnect' between the cause of the alleged blight and the proposed remediation." (*Diamond Bar, supra*, 80 Cal.App.4th at p. 402.)

With respect to Glendora's other blight claims under this provision, the evidence in the administrative record "does not indicate whether the building is unsafe or unhealthy for human purposes." (*Mammoth, supra*, 82 Cal.App.4th at p. 553.) First, with respect to missing antisyphon valves, there is no *evidence* connecting their absence to the condition of unsafe or unhealthy buildings. The only connection offered is the bald assertion in the Miars Report that the absence of antisyphon valves "renders the property unsafe or unhealthy for persons to occupy." Courts properly reject determinations framed in such "conclusionary and summary terms." (*Diamond Bar, supra*, 80 Cal.App.4th at p. 403; see *Mammoth*, at pp. 557–558; *Boelts, supra*, 127 Cal.App.4th at p. 135.) Second, the ADA violations fail as proof for the same reason. The record contains only bare conclusions that they render "the property unsafe to occupy by disabled individuals" or "unsafe to access" by such persons. That is not sufficient. (See *Diamond Bar*, at p. 403; *Mammoth*, at pp. 557–558; *Boelts*, at p. 135.) The third and final remaining claim under this provision rests on the statement in the 2006 GRC Report that several faulty decks "may collapse." But that report does not contain any detail about the condition of those decks or any assessment of the likelihood of structural failure. Beyond that, since the problem is apparently limited to relatively few units, there is no indication that it is "so prevalent and so substantial that it causes a reduction of, or lack of, proper utilization of the area to such an extent that it constitutes a serious physical and economic burden on the community which cannot reasonably be expected to be reversed or alleviated by private enterprise or governmental action, or both, without redevelopment." (§ 33030, subd. (b)(1).)

In sum, there is no adequate showing that defective design or construction has resulted in unsafe or unhealthy buildings so as to constitute blight under this provision.

(iv) *Other factors*

Under the statute, other conditions that may cause unsafe or unhealthy buildings include "faulty or inadequate utilities, or other similar factors." (§ 33031, subd. (a)(1).)

Glendora offers no argument specifying this particular provision of the statute. But some of Glendora's assertions concerning unsafe and unhealthy buildings do not fall within any other portion of subdivision (a)(1). For that reason, we shall briefly address those unassigned assertions here. One relates to hazardous materials; the other relates to infrastructure concerns. As we explain, neither is within the parameters of this provision.

*Hazardous Materials*: Glendora's first unassigned assertion concerns hazardous materials. According to Glendora: "Many properties are rendered unsafe and unhealthy because of improper storage and/or use of hazardous materials on-site, which materials include electronic parts with lead or solder, herbicides, oils, and contaminated liquids." Under the version of the statute that applies here, however, such "properties containing hazardous wastes" are characteristic of *economic* blighting conditions. (§ 33031, subd. (b)(1); see *Riverside, supra,* 65 Cal.App.4th at p. 627.) Assuming (without deciding) that the presence of hazardous materials could cause unsafe or unhealthy buildings, thus characterizing *physical* blight, this record contains no evidence showing such causation. Nor does it appear that the referenced hazardous wastes create a problem "so prevalent and so substantial" as to burden the community. (§ 33030, subd. (b)(1); *Riverside,* at p. 627.)

*Infrastructure*: Glendora's other unassigned assertions about unsafe or unhealthy buildings center on its infrastructure concerns, including sewer capacity, drainage, and fire flow. Glendora asserts the existence of "detailed written and photographic evidence of inadequate infrastructure in Project Area 3" with citations to the administrative record, including (1) the Miars Report, (2) the Agenda Item, which summarizes that report, and (3) its Response to Objections, which includes city employees' declarations. The Miars Report addresses several infrastructure concerns, including "sewage capacity and flow problems indicative of faulty or inadequate infrastructure improvements." First, concerning the sewage system in Project Area 3, the report notes that it "is approximately 42 years old. The system has an anticipated 50 year life span." Random inspections of three manhole locations disclosed problems at all three. Glendora's Deputy Director of Public Works declared: "Over the course of the past ten years, the condition of the sewers in Glendora has rapidly declined. I have personally observed raw sewage percolating up from the sewers throughout the Merged Project Area, including significant portions of Project Area 1[]. Unfortunately, my observation of

percolating sewage *is not an isolated incident.*" From these facts, coupled with the estimated $9 million price tag for modernization, the Miars Report concludes: "The dilapidated and failing condition of the sewers constitutes a burden on the community." Second, the Miars Report addresses various drainage and flooding problems, ultimately concluding that "inadequate . . . drainage infrastructure *constitutes a burden on the community.*" Third, the Miars Report also finds water flows in fire hydrants to be inadequate.

As a matter of statutory construction, however, these infrastructure claims do not fall within the ambit of the specific statutory provision under discussion here, which speaks in terms of "faulty or inadequate *utilities,* or other similar factors." (§ 33031, subd. (a)(1), italics added.) The provision does not explicitly address "faulty or inadequate infrastructure," the standard used in the Miars Report and proffered by Glendora here. Under former law, "inadequate public improvements, public facilities, open spaces, and utilities" were among the conditions of *"economic* dislocation, deterioration, or disuse" characteristic of blight. (Former § 33032, subd. (c), italics added; see *Emmington, supra,* 195 Cal.App.3d at p. 499.) Under the version of the statutory scheme applicable to this proceeding, an area that qualifies as both physically and economically blighted may also be "characterized by the existence of inadequate public improvements, parking facilities, or utilities." (§ 33030, subd. (c).) Given this statutory structure, we defer consideration of Glendora's assertions of inadequate infrastructure. Rather than analyzing these assertions as physical blighting conditions resulting in unsafe or unhealthy buildings, we shall discuss them below, in the context of section 33030, subdivision (c), as Glendora itself does.

For all the foregoing reasons, we conclude that the administrative record does not constitute substantial evidence that the buildings in any of the project areas are unsafe or unhealthy for human occupancy under section 33031, subdivision (a)(1).

b. *Conditions preventing viable use; section 33031, subdivision (a)(2)*

In the applicable version of the statute, the second enumerated physical blight condition is: "Factors that prevent or substantially hinder the economically viable use or capacity of buildings or lots. This condition can be caused by a substandard design, inadequate size given present standards and market conditions, lack of parking, or similar factors." (§ 33031, subd. (a)(2).)

This statutory language "shows the Legislature was not interested in merely the existence of the suggested physical conditions. Substantial evidence must show the physical factors actually prevent or substantially hinder

an existing use or lot's economic viability." (*Mammoth, supra,* 82 Cal.App.4th at p. 555.) This language "sets an exacting standard" that must be met in order to justify redevelopment. (*Id.* at p. 558.)

Although Glendora devotes a heading to this provision, most of its arguments under that heading instead relate to other provisions defining physical blight. Glendora does raise one nominally pertinent issue in this five-page section of its brief: inadequate parking. But the cited evidence, from the Miars Report, relates to the lack of ADA-compliant parking stalls, not to the adequacy of parking generally. Furthermore, Glendora makes no attempt to satisfy the statutory requirement that the cited condition must "prevent or substantially hinder the economically viable use or capacity of buildings or lots." (§ 33031, subd. (a)(2).)

The record thus does not sustain a finding of blight under this provision.

### c. *Incompatible uses; section 33031, subdivision (a)(3)*

In the applicable version of the statute, the third enumerated physical blight condition is: "Adjacent or nearby uses that are incompatible with each other and which prevent the economic development of those parcels or other portions of the project area." (§ 33031, subd. (a)(3).)

To establish physical blight under this provision, the redevelopment proponent must "show how these [incompatible] uses are preventing economic development." (*Mammoth, supra,* 82 Cal.App.4th at p. 559; see *Diamond Bar, supra,* 80 Cal.App.4th at p. 404; *Evans, supra,* 128 Cal.App.4th at p. 1149 [report explained how incompatible uses could negatively affect the viability of property].) "A primary purpose of redevelopment is to eliminate blight which private enterprise can not." (*Mammoth,* at p. 559.) "Interpreted from that legislative mandate, subdivision (a)(3) of Health and Safety Code section 33031 requires substantial evidence showing undeveloped or underdeveloped land is not being developed by the private market because of adjacent incompatible uses." (*Ibid.,* italics omitted.) Here, however, there is no evidence that incompatible uses are preventing development or causing lower property values.

According to Glendora, the administrative record presents "substantial evidence of incompatible uses, including interspersed residential uses, preschools, auto repair shops, used car lots, and wood yard, resulting in inadequate parking, poor curb appeal, poor design, poor traffic circulation, all of which created disincentives for economic development." Glendora maintains that the record shows that "incompatible uses decrease property values by 2.9 percent." Glendora also contends that the conditions associated with

the incompatible uses "are disincentives to private sector investment." As support for these assertions, Glendora cites (1) the Miars Report and (2) the 2006 GRC Report. The Miars Report itself cites the 2004 GRC Report, for the proposition that "incompatible uses decrease property values by 2.9%." The cited 2004 GRC Report states: "Non-conforming and incompatible uses have an impact on property values." It provides a table, showing that "the total value of incompatible or non-conforming property is lower than those that are compatible or conforming" by 2.9 percent. As the text accompanying the table explains: "If these properties were improved to the point that they would be assessed at the same value-per-acre as parcels that are conforming compatible, the total value of the proposed Project Area [5] would increase by $376,000." The 2006 GRC Report contains a similar (but apparently updated) table, accompanied by a similar explanation, showing the assessed value of incompatible or nonconforming properties at 12 percent less than their compatible or conforming counterparts.

Glendora's arguments notwithstanding, this evidence fails to establish that the incompatible uses caused the lower property values. There is nothing in the record suggesting that connection. (*Riverside, supra,* 65 Cal.App.4th at p. 627 ["the report points to low taxable sales without linking those to blighting conditions"].) Furthermore, even assuming a causal connection between the incompatible uses and the decline in property value, there is no evidence that "these uses are preventing economic development. For all we know, despite their incompatibility, these uses are economically viable." (*Mammoth, supra,* 82 Cal.App.4th at p. 559.)

On this record, then, there is no substantial evidence of physical blight under section 33031, subdivision (a)(3).

d. *Irregular and inadequate lots; section 33031, subdivision (a)(4)*

 In the applicable version of the statute, the fourth enumerated physical blight condition is: "The existence of subdivided lots of irregular form and shape and inadequate size for proper usefulness and development that are in multiple ownership." (§ 33031, subd. (a)(4).) As its explicit terms indicate, this provision requires a nexus between irregular parcel shape and size and proper usefulness and development. (*Diamond Bar, supra,* 80 Cal.App.4th at p. 405.) Again, however, there is no sufficient evidence in this record of the required nexus.

According to Glendora, the administrative record contains "evidence that over 81% of the buildings within the Project Area [3] could not be built presently because of inadequate parcel sizes." Glendora also states "that at least 308 properties have substandard frontages and need to be combined

with adjacent lots to permit future re-use." Furthermore, "there exist many old, small, free-standing businesses on small parcels scattered throughout commercial areas" with "poor parking and circulation" as well as "out-of-date signage and poor curb appeal" putting them "at an economic disadvantage." Glendora cites the 2006 GRC Report for this data. That report characterizes the "shape and size of numerous parcels in the Project Area" as "a substantial problem" and "a particular problem when trying to implement the Route 66 Corridor Specific Plan"—a plan that envisions "development design guidelines, lot consolidation and development incentives, streetscape improvement and development standards that implement the community's vision for quality development." The 2006 GRC Report gives six examples of irregular parcels. It confirms the plight of the older businesses occupying the smaller lots, saying: "Obsolete commercial buildings with out-of-date signage are at a disadvantage to more modern buildings." Nothing in the report ties that disadvantage to parcel size or shape, however.

While the report discloses the existence of smaller parcels, some irregularly shaped, many unbuildable today, it does not address the statutory criteria of proper usefulness and development. (§ 33031, subd. (a)(4).) As was the case in *Diamond Bar*, "there is no showing that the size and shape of any of these parcels renders them inadequate for 'proper usefulness and development.' " (*Diamond Bar, supra*, 80 Cal.App.4th at p. 405.)

The record thus does not demonstrate physical blight under section 33031, subdivision (a)(4). Given the absence of such a showing, there is no reason to consider the alternative blight formulation available under section 33030, subdivision (b)(2)(B). (*Diamond Bar, supra*, 80 Cal.App.4th at p. 406.)

3. *Economic Blight Conditions; Section 33031, Subdivision (b)*

It is unnecessary to reach the question of economic blight under section 33031, subdivision (b). As noted above, there must be "at least one type of physical blight and one type of economic blight" to satisfy the statutory definition. (*Evans, supra*, 128 Cal.App.4th at p. 1147; see *San Franciscans, supra*, 102 Cal.App.4th at p. 700; § 33030, subd. (b)(2)(A).) Lacking substantial evidence that the project areas suffer "from at least one of the statutorily prescribed physical conditions which cause blight," we need not consider whether economic blight exists. (*Mammoth, supra*, 82 Cal.App.4th at p. 560; see *Diamond Bar, supra*, 80 Cal.App.4th at p. 405.)

4. *Community Burden; Section 33030, Subdivision (b)(1)*

For the same reason, it is unnecessary to consider whether the combination of blight conditions "is so prevalent and so substantial that it causes a

reduction of, or lack of, proper utilization of the area to such an extent that it constitutes a serious physical and economic burden on the community which cannot reasonably be expected to be reversed or alleviated by private enterprise or governmental action, or both, without redevelopment." (§ 33030, subd. (b)(1).) Since physical blight is not shown here, "there is no substantial evidence by which [Glendora] could determine the combination of both physical and economic conditions causing blight are so prevalent they can only be remedied through redevelopment." (*Mammoth, supra*, 82 Cal.App.4th at p. 560.) For that reason, we need not and do not reach the issue. (*Ibid.*)

### 5. *Inadequate Infrastructure: Section 33030, Subdivision (c)*

#### a. *Glendora's claim*

Glendora cites "detailed written and photographic evidence of inadequate infrastructure in Project Area 3" in the administrative record, described above in our discussion of physical blight under section 33031, subdivision (a)(1). In its opening brief, Glendora argues: "Section 33030(c) states that inadequate infrastructure constitutes a condition of physical blight." In its reply brief, Glendora maintains that even "assuming the absence of any other blighting influences, the Administrative Record provides a vast body of evidence establishing other, more serious conditions of physical blight throughout Project Area 3, including inadequate sewers, fire flow and storm drain facilities affecting every single building in Project Area 3."

#### b. *Legal framework*

The relevant statutory provision has changed over the years. In 1993, the Legislature "eliminated the category of inadequate public improvements as a condition for finding blight." (Coomes, Redevelopment in Cal., *supra*, at p. 218.) "However, the current law retains inadequate public improvements or inadequate water or sewer utilities as part of the broader definition of redevelopment so that an agency could document these problems and use its authority to construct necessary public improvements." (*Ibid.*)[11]

The version of the provision applicable to this proceeding reads as follows: "A blighted area also may be one that contains the conditions described in subdivision (b) [of section 33030] and is, *in addition*, characterized by the existence of inadequate public improvements, parking facilities,

---

[11] The commentator's reference is to section 33030, subdivision (c), as amended effective January 1, 2007. That version of the provision is substantially identical to the 2006 version that governs here. The 2007 version reads as follows: "A blighted area that contains the conditions described in subdivision (b) may also be characterized by the existence of inadequate public improvements or inadequate water or sewer utilities." (Stats. 2006, ch. 595, § 2.)

or utilities." (§ 33030, subd. (c), italics added.) An area contains the conditions described in section 33030, subdivision (b), if it is characterized by at least one condition of physical blight in combination with at least one condition of economic blight. (§ 33030, subd. (b)(2)(A).) Thus, under applicable law, problems of "inadequate public improvements" may be considered in determining whether an area is blighted, but only *if and after* the other definitional criteria for blight have been established. (§ 33030, subd. (c).)

### c. *Application*

In this case, we need not consider Glendora's infrastructure claims. As discussed above, none of Glendora's project areas exhibits any physical blight conditions. For that reason, none contains the conditions described in section 33030, subdivision (b). Section 33030, subdivision (c), thus does not come into play. (Cf. *Diamond Bar, supra*, 80 Cal.App.4th at pp. 406–407 [rejecting the city's infrastructure arguments on the merits, despite finding no physical blight conditions].)

Even if we were to reach those claims on the merits, we would reject them. Under this provision, there must be evidence that the "lack of infrastructure has rendered the land stagnant or unproductive." (*Emmington, supra*, 195 Cal.App.3d at p. 500; see *Sweetwater Valley Civic Assn. v. City of National City, supra*, 18 Cal.3d at p. 279 [drainage and other problems, "while no doubt burdening the property, have not ended its present economic use"].) That evidence is lacking here. While we do not doubt the seriousness of sewage overflow and other specific problems cited by Glendora, no context is given to demonstrate either the prevalence of such problems or their impact on the affected properties' economic viability. (See *Diamond Bar, supra*, 80 Cal.App.4th at p. 406 [city presented only "generalities as to why the infrastructure is deficient"].) The record presents only bare conclusions by Miars that "inadequate . . . infrastructure constitutes a burden on the community." Such "conclusionary and summary" statements are not sufficient proof. (*Id.* at p. 403.) "While it cannot be denied that the project area would benefit from improved roads, . . . sewage improvements, and other public projects envisioned by the redevelopment plan, there is no showing that the lack of such improvements has unduly burdened the existing . . . use of the area." (*Emmington*, at p. 500.)

## CONCLUSION

 Having reviewed the administrative record de novo, we find no substantial evidence of physical blighting conditions under section 33031, subdivision (a). For that reason, we do not consider the existence of economic blight under section 33031, subdivision (b). For the same reason,

section 33030, subdivision (c), does not come into play, and we do not consider whether Glendora's inadequate infrastructure claims constitute blight. Even if we were to consider those infrastructure claims, we would reject them on the merits.

In the absence of blight, the redevelopment plan is invalid. The trial court therefore acted properly invalidating ordinance No. 1845.

## DISPOSITION

The April 2008 judgment of the trial court is affirmed.

Bamattre-Manoukian, Acting P. J., and Duffy, J., concurred.

Appellants' petition for review by the Supreme Court was denied September 29, 2010, S184829.